STATE, EX REL. NEBRASKA STATE BAR ASSOCIATION, RELATOR,
v. I. C. BACHELOR, RESPONDENT.

297 N. W. 138

FILED MARCH 28, 1941.   No. 30791.

*Walter R. Johnson, Attorney General,* and *Rush C. Clarke,* for relator.

*Harry F. Russell,* for respondent.

Heard before SIMMONS, C. J., EBERLY, PAINE, CARTER, MESSMORE and JOHNSEN, JJ.

EBERLY, J.

This is a proceeding to disbar I. C. Bachelor, a resident of McCook, Red Willow county, Nebraska, who is 76 years of age, was admitted to the Nebraska Bar on May 21, 1891, and who is now a member of the Nebraska State Bar Association. The State of Nebraska, on the relation of the Nebraska State Bar Association, acting by and through the complaint committee of the fourteenth judicial district of Nebraska, filed a complaint in writing setting forth, in substance, that an informal complaint had been made to said committee of claimed professional misconduct on the part of I. C. Bachelor of McCook, Nebraska, a member of the

254

Nebraska State Bar Association. Upon informal investigation a majority of the aforesaid committee determined "that there are reasonable grounds for said complaint," and we "do therefore, for the purpose of having a full and complete investigation of the charges heretofore made against said member, charge and complain as follows:" Then follow nine counts, each properly and specifically setting forth transactions in which participation by Bachelor is alleged as culpable and constitutes unprofessional conduct on his part. This complaint is formally subscribed by two members of the complaint committee. The third member, being a witness to a number of the transactions, did not sign the complaint. The complaint, as such, is not verified by the oaths of the committee members and this practice is not deemed improper. This complaint covers eight typewritten pages.

To this complaint, Bachelor, as respondent, filed his answer in writing, positively verified under oath, which denies "each and every allegation in each count not herein specifically admitted," and further pleads specifically to the charges contained in each of the nine counts of the complaint, substantially taking issue with the allegations therein which charge or tend to charge the respondent with unprofessional conduct in his capacity as an attorney at law which would subject him to disbarment.

As provided by the rules of this court, a referee was duly appointed, and hearings were had on the issues thus formed. The complainant was represented by the attorney general's office and the respondent by his attorney. The referee has filed his report in which the respondent is adjudged guilty on the first, second, fifth, and seventh counts; but in effect not guilty on the third, fourth, sixth, eighth and ninth counts; though notwithstanding, as to count three, the express finding of the referee is: "The evidence in support of this count is, in my opinion, insufficient to show by itself a cause for disbarment or any moral turpitude." Yet, he adds, "It is, however, an additional circumstance which may be considered as throwing some light upon the fitness of

the respondent to engage in the practice of law." As to the charges contained in the eighth count, the referee states his determination in the following manner: "It is therefore my conclusion that, standing alone, this count and the evidence in support thereof would be insufficient to sustain a disbarment proceeding, but, taken in connection with other proven counts, shows a method of dealing with his clients' money which is in violation of Canon 11 of the Canons of Professional Ethics, and such as tends to bring discredit upon the profession in general."

The conclusion of the referee's report is:

"It is therefore recommended, That the name of I. C. Bachelor be stricken from the roll of attorneys and counselors at law of the State of Nebraska, and his admission to the Bar of the state be canceled and annulled."

The question presented by the referee's report, stated briefly and comprehensively, is, does the record before us sustain the disposition recommended by the referee?

We have here presented essentially a civil proceeding, and the recognized rules governing that practice are controlling.

"The order of admission is the judgment of the court that the parties possess the requisite qualifications as attorneys and counselors, and are entitled to appear as such and conduct causes therein. From its entry the parties become officers of the court, and are responsible to it for professional misconduct. They hold their offices during good behavior, and can only be deprived of it for misconduct ascertained and declared by the judgment of the court after opportunity to be heard has been afforded. (*Ex parte Heyfron*, 7 How. (Miss.) 127; *Fletcher v. Daingerfield*, 20 Cal. 430.)" *Ex parte Garland*, 4 Wall. (U. S.) 333, 378.

"The attorney and counselor being, by the solemn judicial act of the court, clothed with his office, does not hold it as a matter of grace and favor. The right which it confers upon him to appear for suitors, and to argue causes, is something more than a mere indulgence, revocable at the pleasure of the court, or at the command of the legislature.

It is a right of which he can only be deprived by the judgment of the court, for moral or professional delinquency." *Ex parte Garland, supra.*

Chief Justice Marshall of the supreme court of the United States announced the doctrine of the importance of the enforcement of the accepted rules of evidence in civil proceedings in the following language:

"It was very justly observed, by a great judge, that 'all questions upon the rules of evidence are of vast importance to all orders and degrees of men; our lives, our liberty, and our property are all concerned in the support of these rules, which have been matured by the wisdom of ages, and are now revered from their antiquity, and the good sense in which they are founded.' One of these rules is, that 'hearsay' evidence is, in its own nature, inadmissible. That this species of testimony supposes some better testimony which might be adduced in the particular case, is not the sole ground of its exclusion. Its intrinsic weakness, its incompetency to satisfy the mind of the existence of the fact, and the frauds which might be practiced under its cover, combine to support the rule that hearsay evidence is totally inadmissible." *Queen v. Hepburn,* 7 Cranch (U. S.) 290.

So too, "The power (to disbar), however, is not an arbitrary and despotic one, to be exercised at the pleasure of the court, or from passion, prejudice, or personal hostility; but it is the duty of the court to exercise and regulate it by a sound and just judicial discretion, whereby the rights and independence of the bar may be as scrupulously guarded and maintained by the court, as the rights and dignity of the court itself." *Ex parte Secombe,* 19 How. (U. S.) 9.

A court of recognized standing has announced, in substance, the following rule, as applicable to proceedings of disbarment: In such a proceeding, where a denial is made of the charges, the common-law rules of evidence apply. The accused is not to be tried upon affidavits, but is entitled to confront the witnesses, subject them to cross-examination, and to invoke the well-settled rules of evidence. See *In re Eldridge,* 82 N. Y. 161.

. In harmony with the principles supported by the foregoing authorities cited, this court in the case of *In re Newby*, 82 Neb. 235, 252, 117 N. W. 691, in an opinion by Letton, J., involving disbarment of an attorney on a charge of participation in a forgery, employed the following language, which was unanimously approved: "While the proceedings in this matter are not criminal in their nature, in view of the momentous consequences to the person charged, involving his means of obtaining a livelihood from his profession and his reputation as an honest and honorable man, the presumption of innocence applied, and his culpability must be established by at least a clear preponderance of the evidence. The court should be satisfied to a reasonable certainty that the charges are true. *State v. Wines*, 21 Mont. 464; *In re Parsons*, 35 Mont. 478; *In re Smith*, 73 Kan. 743. In fact, a New York court held that, 'the deprivation for life of a man's vocation should only result from grave malpractice, established beyond a reasonable doubt.' *Matter of Mashbir*, 44 N. Y. App. 632, 60 N. Y. Supp. 451."

The application made of the doctrine thus announced clearly appears in the final paragraph of the opinion in such *Newby* case, which reads as follows:

"We cannot say that we are satisfied from the evidence that he (Newby) is innocent of the charges made against him, nor can we say that we are satisfied to a reasonable certainty of his guilt. The mind of the court being in this condition, it is our duty to give Mr. Newby the benefit of the doubt, and to hold that the charges have not been sustained by the evidence to such an extent as to warrant the infliction of the severe penalty that must inevitably have followed had we been fully satisfied of his guilt."

The most serious charge made against Bachelor, and of which he was found guilty by the referee, is contained in the first count of the specifications on which he was tried. In it, in effect, he is charged with having become a party to the crime of arson, committed by Jake Degele, by unlawfully and feloniously burning and destroying the larger of two dwelling-houses situated on the SW1/4 of the SW1/4

of section 33, township 3 north, range 28 west of the 6th P. M., in Red Willow county, Nebraska. Degele, the record discloses, pleaded guilty to this charge of arson, and was sentenced thereon to confinement in .the state penitentiary. So far as disclosed by the record before us, no criminal charges have been instituted against Bachelor in relation to the commission of this crime of arson. The real property here involved, including the larger house thereon, which was thus destroyed, was, at and prior to its destruction, owned by the wife of Jake Degele, and had been inherited by her from a former husband, since deceased. Two dwelling-houses were situated on this property, the larger being the one thus burned and destroyed, and the smaller occupied by Mrs. and Mr. Degele as a family home. It thus clearly appears that the real estate with which we are here concerned constituted the statutory separate estate of the wife, whose name does not otherwise appear in this record than as the wife of Jake Degele. The record also sustains the conclusion that at some time in the past this real estate, including the two dwelling-houses thereon, had been mortgaged to secure the repayment of a loan, the exact amount of which the proof does not disclose, and default in the payment thereof had been made; that foreclosure proceedings had been instituted thereon, and a decree of foreclosure had been duly entered; that in due course of time an order of sale was issued on this decree and the premises were sold pursuant to the decree; that Bachelor was then employed, and in behalf of Degeles filed objections to such sale, which, on hearing, were sustained by the district court and such sale vacated and set aside. The mortgaged premises had then been readvertised and again sold, and these proceedings were awaiting confirmation by the district court. Just prior to the time set for confirmation the larger dwelling-house was destroyed by fire, as to which Mr. Degele later pleaded guilty to a charge of arson. There is a dearth of evidence as to the insurance involved in this fire. Neither the original policy nor a copy thereof appears in evidence. The name of the insurer is not given. The

name of the "assured" is not expressly established, save as we may infer it from the facts of the record as an entirety. The amount of insurance on the destroyed dwelling-house is not shown with exactness, and while the proof indicates that there was a settlement made by the insurance company, the amount by it paid, and to whom, is not disclosed. The evidence is undenied that Bachelor has never seen the policy. The parties interested in this present proceeding appear to be in general agreement that the improvements on the mortgaged property had been insured against fire, and that, under the terms of the insurance policy then in force, the larger dwelling-house on the premises was insured in an amount that exceeded, in a substantial sum, the total indebtedness against the property as evidenced by the real estate mortgage securing the same. Therefore, in view of all the facts disclosed by the evidence in the record, and the further fact that we, of necessity, take notice of the ordinary course of business and the common methods by which it is transacted, we shall assume, as a working hypothesis in this case, that at the time of the destruction of the larger dwelling by fire a valid policy of fire insurance existed, in which Mrs. Degele, as owner in fee simple, is named as assured, and which in proper terms agreed to indemnify the assured against loss or damage by fire to the larger dwelling-house in a sum in excess of the total amount secured by the real estate mortgage; that attached to such insurance policy was the usual real estate mortgage clause by the terms of which loss under the terms of such policy was payable to the mortgagee named therein as its interest might appear. It is the theory of the prosecution in this proceeding that in this situation Bachelor, with knowledge thereof, inspired, advised, counseled and influenced Jake Degele, while the relation of client and attorney existed between them, to feloniously burn the larger house for the purpose of receiving the insurance money arising therefrom, and with it pay off the mortgage indebtedness and thus redeem the entire real estate from the lien of the foreclosure decree.

Jake Degele, then a convict incarcerated in the state penitentiary, being produced as a witness for the prosecution at the regular hearing of this proceeding before the referee, testified, with reference to the dwelling-house destroyed by fire on these premises, as follows: "Q. Did you ever have a talk with Mr. Bachelor before the fire with reference to the burning of one of the houses on your farm? A. No. Now don't ask me any more questions, because I ain't going to answer them unless I can get an attorney to tell me what to do."

Pursuant to notice duly served, Degele's deposition had been taken by the prosecution, prior to this appearance before the referee, in which, in response to queries propounded by the attorney general's office, he had testified as follows:

"Q. When did you set fire to this house with reference to that confirmation? A. I set fire to it in the morning. Q. The morning of the 21st of September, 1938? A. Yes. Q. How long had this foreclosure action been pending against you in the district court? A. It come up and we took the nine months stay as the law allowed us and then it was advertised and sold once and the judge wouldn't let it go through so it had to be advertised again. Q. It was pending how long? A. Two years. Q. Who represented you as your lawyers in that foreclosure action? A. Mr. I. C. Bachelor. Q. Who is here in the room at this time? A. Yes. Q. Now before you burned this house, as you have testified, did you ever talk with Mr. Bachelor about burning the house? A. No. Q. Did you ever have any conversation with him in which that was mentioned? A. No; I never did. Q. Did he at any time advise you to burn this house or any property on your farm? A. No. Q. Did he know before you burned the house that you were going to do so? A. No, sir. Q. Now you afterwards pleaded guilty to arson in connection with that? A. I did."

This deposition was received in evidence.

Bachelor was also sworn and testified in his own behalf. He clearly and unequivocally denied all knowledge of, or

participation in, the commission of the crime of arson, of which Degele had pleaded guilty. He specifically denied having in any manner inspired, advised, or counseled the commission of the same, and also denied all knowledge of intent on the part of his client to commit the same.

The prosecution, after Degele, their witness, had testified as hereinbefore set forth, continued a cross-examination of him with reference to oral and written contradictory statements previously made by him, as to the burning of the building, but admittedly not made in the presence of Bachelor, not claimed to have been in proceedings to which the latter was a party or present, and in which he was entitled to no rights of cross-examination. This cross-examination of Degele included testimony given by him before the state board of pardons, a transcript of which was offered and received in evidence. It may be said that every statement thereof and therein which in any manner tended to incriminate Bachelor was then, in this cross-examination, wholly repudiated by Degele as untrue and wholly inconsistent with the actual facts. It would serve no purpose to set forth this evidence thus admitted and concerning which this witness was cross-examined. Considered with reference to the actual issues presented by count one of the charges here under consideration, this evidence thus introduced by the prosecution, by and in aid of this cross-examination of their own witness, was clearly within the well-established rule of exclusion as hearsay. The authority for, and limited object to be attained by, the introduction of this line of proof is discussed in *Masourides v. State*, 86 Neb. 105, 125 N. W. 132, and *Erdman v. State*, 90 Neb. 642, 134 N. W. 258, both cases being later modified by rule of this court in *Penhansky v. Drake Realty Construction Co.*, 109 Neb. 120, 190 N. W. 265. See, also, *Lewis v. Miller*, 119 Neb. 765, 230 N. W. 769; *Mason v. Reynolds*, 135 Neb. 773, 284 N. W. 257; *Blochowitz v. Blochowitz*, 122 Neb. 385, 393, 240 N. W. 586. If this line of evidence was properly received, a question which the record before us does not impose upon us the duty of determining, still its effectiveness and pro-

bative force is limited solely to the credibility of Degele. "Evidence of such contradictory statements is admitted only to discredit the witness; it is not affirmative evidence of the facts stated." 3 Jones, Evidence, Civil Cases (4th ed.) 1564. See, also, *Branford Trust Co. v. Prudential Ins. Co.*, 102 Conn. 481, 129 Atl. 379, 42 A. L. R. 1450; 28 R. C. L. 633, sec. 219.

In the text just above quoted from, at page 1591, it is said: "Finally, attention is invited to the probative effect of impeaching testimony consisting of contradictory or inconsistent statements of witnesses. It often happens that such testimony is of vital importance in its effect upon the credit of the witness; and it is not infrequent that jurors fail to understand that such testimony is only received to affect the credibility of witnesses. In other words, the impeaching testimony does not establish or in any way tend to establish the truth of the matters contained in the contradictory statements." 3 Jones, Evidence, Civil Cases (4th ed.) 1591. See, also, *Law v. Fairfield*, 46 Vt. 425; *Jensen v. Michigan C. R. Co.*, 102 Mich. 176, 60 N. W. 57; *Seller v. Jenkins*, 97 Ind. 430; *Davis v. Hardy*, 76 Ind. 272.

It follows that, giving full force and effect to all the testimony in the record relating to the charges contained in count one of the charges and specifications against Bachelor, there is not a scintilla of competent evidence which in any way tends to sustain the allegation that he inspired, participated in, or counseled the commission of the crime of arson. Nor is Bachelor subject to criticism on account of the promptness with which he undertook the collection of the insurance money. There is not in the entire record a word of proof which tends to impute to Mrs. Degele prior knowledge of, approval of, or the slightest participation in, the crime of arson committed by her husband. She was the owner of the destroyed property, and as such was the "assured" named in the policy originally issued on her real estate, and was entitled to the insurance money, in the absence of prior knowledge of, or participation in, the crime of arson. Existing marital relations did

not of themselves deprive her of her rights. We have clearly announced this rule:

"The mere fact that the wife was present when a tortious act is committed by her husband raises no presumption that the act was committed by him as her agent, even though the act has some connection with or reference to her separate estate, when it is not shown that she participated, nor that she encouraged or instigated him to do the act, and where there is no other evidence of agency." *Carnahan v. Cummings,* 105 Neb. 337, 180 N. W. 558.

And, in an insurance case, where the insurance company sought to defend on the basis that the destructive fire had been caused by the husband, this court announced the rule:

"That an insured building was burned by a third party is no defense in an action on the policy, in the absence of a showing that the party insured was privy to such burning." *Union Ins. Co. v. McCullough,* 2 Neb. (Unof.) 198, 96 N. W. 79.

It is obvious that Bachelor, under the facts of this situation so far as revealed by the record before us, was justified in acting without hesitation or delay to secure the collection of the amount due on the insurance policy. It thus clearly appears that there has been an entire failure of proof to sustain the charges contained in count one of the charges in this case.

The second count of the charges against Bachelor, in effect, is that during the trial of a case commenced in the county court of Red Willow county, Nebraska, on November 21, 1932, upon a promissory note of $250, bearing date September 1, 1931, made and delivered to the Farmers & Merchants State Bank of McCook, payee named therein, by I. C. Bachelor and M. G. Welch, respondent Bachelor on February 3, 1933, introduced in evidence a check of which the following is a copy:

"Farmers & Merchants State Bank,
          "McCook, Nebr. 7/27-1931.  No.———
"Pay to the order of Farmers & Merchants Bank $62.00
"Sixty Two & no/100 Dollars
"For———                          I. C. Bachelor."

That affixed thereon at the time this instrument was received in evidence was what all parties recognize as the official "paid" stamp of the Farmers & Merchants State Bank of McCook, which by perforation in this check clearly discloses that this check had been paid by that institution on "1/27/31," which clearly proclaims that the check had been paid January 27, 1931, by the drawee named therein. This instrument had no indorsements on the back thereof. It is now claimed that the original check fairly discloses that the date thereon had been changed from "1/27/31" to "7/27/31;" that Bachelor introduced the check in evidence in support of his claim that the sum of $62, in controversy, had by means of this check been transferred or paid to the Farmers & Merchants State Bank of McCook prior to the giving of the note in suit, while another note was held by this bank to which the note in suit was in the line of renewals, but which amount so paid had never been credited on his indebtedness by the bank, and that he was entitled to credit of that amount on the note in suit. The gist of the charge contained in this second count is that "The respondent offered said check in evidence, and claimed the same as a credit upon said note in suit, with the knowledge that the check had been altered, and that same was a fraud, and that by so doing the respondent herein was and became guilty of unprofessional conduct."

The referee found: That this charge "is sustained by the evidence;" that "the check itself is in evidence and shows conclusively that it has been altered" as to date thereof; that "a figure '7' has been made with a pen over the original figure '1,' but the perforations and marks of the canceling machine show that the check was paid by the bank on '1/27/31.' * * * The original bank statement does not show any charge against the respondent's bank account of $62 on July 27, 1931; the respondent was the only one to be benefited by the introduction of this check and the credit sought thereby. The respondent admits receiving this check from the bank with his other canceled checks, and that it was continuously in his possession from

the time it was returned by the bank until it was introduced in evidence." Therefore, the referee determined, in view of the claim for credit made by the accused, that the conclusion of his guilt must be deemed established "beyond a reasonable doubt."

We do not approve of this determination of the referee, nor are we in accord with his conclusion as to the force and effect of the evidence upon which it is based. It is true there is in evidence what purports to be a ledger sheet of the I. C. Bachelor checking account with the Farmers & Merchants State Bank of McCook, Nebraska. The sufficiency of its general foundation for admission as evidence might be seriously questioned, but we do not raise that question now. But the first entry shown on this ledger sheet, exhibit 5 as it is designated by the reporter, is July 9, 1931, and the last entry made thereon is September 26, 1931, and discloses a credit balance of $2 05. We understand from the record of the entire cause that this account closes with the bankruptcy of the bank. And it may be said that among 87 checks entered on this exhibit 5 there are none of the denomination of $62. But it will be remembered that this $62 check bears the official "paid" stamp of the bank as of "1/27/31" and that no ledger sheet covering the period from January 27, 1931, to July 8, 1931, both inclusive, was introduced in evidence or forms any part of the record. Bachelor's sworn testimony is that with reference to exhibit 5 he filed a claim in the receivership proceeding of this bank based on his claim that exhibit 5 was incorrect and that the bank was indebted to him in an amount that exceeded the balance shown by his account of $2 05 at the time of the "closing" of the bank, and that the district court, after hearing, allowed his claim in excess of $200, which was paid him. If this statement is in error the court records were easily available where this hearing was had and would have disclosed that fact. It appears, however, the statement remains unanswered in the record. On the contrary we note the following indorsement on the back of the $250 note of September 1, 1931, a part of the

266

records in this case: "April 29, 1932. Set-off by order of the Dist. Court $100.16." While this may be said to be consistent with Bachelor's statement, it does not necessarily confirm it. But it would seem that, when bank records are successfully impeached, positive inferences may not be drawn from omissions therein contained, but the payment of the $62 check must be deemed to be established, so far as this record is concerned, solely by the "paid" stamp now appearing thereon. Bachelor's contention fairly appears from the following excerpt of his cross-examination:

"Q. Now, what I want you to say now, when do you now say you gave that check, July 27th, 1931, or January 27th, 1931? A. Well, I gave the check at the time that it was marked paid; I am quite certain. Q. That was some four months before the original note had been executed by you, wasn't it? A. No; no, I had given several notes to the bank. Q. And you are not able at all to in any way account for the alteration of that check? A. No, sir; I don't know how it became altered; I know that I never altered it."

What actually occurred at the trial of this county court case on February 3, 1933, was that Bachelor was sworn as a witness and testified as to the claimed payment of $62, to which he claimed credit. At the conclusion of his testimony the check, exhibit 4, was offered by respondent generally as a part of his testimony. There is no evidence that the instrument was then read to the court by the accused. Bachelor handed it to the counsel representing the plaintiff receiver. This attorney passed it to the county judge presiding, who received it in evidence, and after he had looked at the face of the check the county judge said the date had been altered. There is evidence in the record that Bachelor challenged the correctness of this statement, and vehemently denied that any alteration had been made of the check by him. It appears that the matter of the "paid" date thereon was not discussed at this time. It is obvious that Bachelor's culpability, if such there be, in the use made by him of this instrument, must be determined by the legitimate inferences which that document at the time and place

as used will support. This is not claimed to be a forged instrument, but is concededly genuine, save only it is charged that the date of the same has been fraudulently altered. If then it be conceded, for the purpose of argument, that it is in part a forged instrument, still the use of the check as evidence of what the unaltered parts thereof establish beyond a reasonable doubt could hardly be said to establish the moral depravity of one who made use of it as proof to establish the truth.

We are here dealing with a check after it has served its purpose, and after the transfer of money directed by its terms has been fully accomplished and the instrument itself returned to the maker.

"Although mere bookkeeping entries by the drawee bank, with reference to a check or order, are mere evidence of payment, through which the court may look to determine the exact facts with reference to payment, where the bank receives the check, marks it 'paid,' debits the account of the maker, and returns it, this is not a mere booking entry, but constitutes a payment." 9 C. J. S. 698, sec. 349.

We assume that the presence of the drawee bank's "paid" stamp on the face of this check at least affords *prima facie* evidence of its actual payment. If this check, when and as introduced in evidence, giving full force and effect to its probative force, established and tended to establish only admitted facts and facts wholly consistent with truth, then its use as proof cannot be deemed a "fraudulent" use, nor can the instrument itself be characterized as a "fraud." What was the evidential force and effect of this check?

The date written by the drawer upon his check is no evidence of the date the drawee bank will pay it. Under the record in this case, accepting the "paid" stamp in the form of perforations affixed to the check in controversy as the sole competent evidence of the act of payment by the drawee bank found in the record, it constitutes the only evidence binding upon it and carries no implications beyond those clearly expressed by it. It does not imply that the money thus paid was received and applied, or required to be ap-

plied, to any particular purpose. It sustains no implication that the $62 transferred by the check and received by the payee bank was to be applied on the drawer's indebtedness to the drawee bank then existing. It only and clearly evidences that the check was "cashed" on "1/27/31," a fact which no one now questions.

The bank check in the instant case is in the usual form and, after having been returned to the drawer by the drawee bank, its legal evidential effect was determinable by the rule announced in *Ottens v. Fred Krug Brewing Co.*, 58 Neb. 331, 78 N. W. 622: "A bank check in the usual form is not, even when paid and returned to the drawer, an acknowledgment that the money therein mentioned has been received for, and applied to, a particular purpose."

Its terms clearly evidence as a fact that the check in controversy was cashed by the drawee bank on "1/27/31." At that point its probative force ends. *Ottens v. Fred Krug Brewing Co., supra.* This conclusion is equally inevitable whether the check be deemed to bear the date "1/27/31" as its proper date of issue, or to be properly dated "7/27/31." It necessarily follows that the change of date, if such there was, was wholly immaterial.

"An alteration of a written instrument after its execution by one party thereto, without the knowledge or consent of the other, which neither varies its meaning nor changes its legal effect, is an immaterial alteration, and will not invalidate the instrument." *Fisherdick v. Hutton,* 44 Neb. 122, 62 N. W. 488.

But even where a written instrument shows upon its face a material and obvious alteration, the presumption of law is that such alteration was made before the instrument was issued and delivered. *Dorsey v. Conrad,* 49 Neb. 443, 68 N. W. 645; *Colby v. Foxworthy,* 80 Neb. 239, 114 N. W. 174; *Collins v. Hughes & Riddle,* 134 Neb. 380, 278 N. W. 888; *Strang State Bank v. Union Lumber Co.,* 120 Neb. 384, 232 N. W. 732.

There is no affirmative evidence as to the condition of the date of issue when this check (more than ten years ago)

was presented to and paid by the drawee bank, now insolvent. We have no definite evidence as to how long this check was held by the drawee bank after its payment or the exact date when it was actually returned to the drawer. We have no evidence that the fact of this payment was ever entered upon the records of this insolvent institution or whether or not it had been at any time carried by this insolvent institution as a cash item. There is evidence in the record that at the time of the appointment of the bank receiver Bachelor's ledger account was erroneous and approximately $100 out of balance. The present condition as to the date of issue of this check first came to light on February 3, 1933. The question then arose on the trial of the case of Luikart, Receiver, v. Bachelor *et al.*, wherein Bachelor challenged the truth of the charge of alteration and emphatically insisted that he had in no manner altered or caused the change to be made in the date of issue of the check. By limitation of this record, essentially so far as questions of fact are concerned, we are restricted to the face and terms of the check, from which we find at most an irregularity. This instrument bears date of July 27, 1931. It is stamped as paid by the drawee bank on January 27, 1931. Thus it clearly appears on the face of this check now, as well as when offered in evidence in 1933, that the date of issue now written thereon is an "impossible date." This in turn invokes the application of the rule: "An impossible date raises a presumption of *ante* or *post* dating; but not of alteration." 1 Ency. of Evidence, 788.

It follows that the only legal purpose served by the introduction of the check in controversy was the establishment of the date and amount of payment made thereon by the drawee bank. This constituted the inherent nature as well as limitation of the proof offered. The effect of its receipt in evidence was to accept it as proof as to date and amount of payment only within the limitation suggested. *Ottens v. Fred Krug Brewing Co.*, 58 Neb. 331, 78 N. W. 622. So considered the date of issue upon this check was wholly immaterial and the check itself was neither a fraud,

nor the employment thereof by an attorney a fraudulent use, for the limited facts it established were strictly consistent with the truth. What actually happened and its actual legal effect controls and governs, and that wholly unaffected by doubts and suspicions, if any, otherwise arising concerning the true purpose of respondent. For it is a well-established rule that "An immaterial alteration is not made material simply by the intent to give thereby a different effect to the instrument, if such intent is not in fact effectuated by the alteration." *Robinson v. Phoenix Ins. Co.*, 25 Ia. 430. Putting the same principle in slightly different form: "If an alteration is immaterial, the intent with which it was made is immaterial." *Fuller v. Green*, 64 Wis. 159, 24 N. W. 907. It follows that we must hold that the record before us wholly fails to establish culpability on part of the accused of the offense charged in the second count of the complaint herein.

The referee has determined that the charge contained in the fifth count of the complaint filed in this proceeding was sustained by the proof adduced, and that the respondent was thereby convicted of unprofessional conduct in violation of the twenty-fifth Canon of Professional Ethics. The subject of the twenty-fifth Canon is "Taking Technical Advantage of Opposite Counsel; Agreements With Him." It is respondent's acts as an attorney at law representing a corporation known as the "Fair Price Oil Company" that are challenged, and the questioned transactions occurred as early as 1932. There are no written records nor any evidence in writing relating to the same contained in the record before us. We have a single witness testifying in behalf of the state, and the respondent is the sole witness in his behalf.

It appears that in the early days of 1932 the Altitude Petroleum Company sued the Fair Price Oil Company for something in excess of $500. With reference to this transaction the attorney for the Petroleum Company testifies as follows: "As I recall it, the first occasion I saw Mr. Bachelor was at the county judge's office; he had filed an answer,

I believe, in the case and, as I said a moment ago, I think the time was early in 1932, and he told me that there was no one present, as I remember; and he asked that I not take judgment against the Fair Price Oil Company. He stated that the company wasn't making any money; that they were going to cease business and sell out what they had on hand, their equipment. He stated that the gas pumps were to be turned back to a company I believe he said was in South Dakota. They had been sold, he said, to the Fair Price Oil Company under conditional sales contract. He further stated that the tin building which was situated on a rented lot and which constituted the service station was being sold to the Coryell Oil Company, I believe, and the only thing they had was some gasoline which was to be sold. He said that after the gasoline tax was paid he thought there would be between three and four hundred dollars left, and that he would pay that entire amount to our law firm as attorneys for the Altitude Petroleum Company."

This proposition was then orally accepted, and the Altitude Petroleum Company "didn't take judgment."

It may be noted, in passing, that section 7-107, Comp. St. 1929, provides in part:

"An attorney or counselor has power; * * * Second. To bind his client by his agreement in respect to any proceeding within the scope of his proper duties and powers; but no evidence of any such agreement is receivable, except the statement of the attorney himself, his written agreement signed and filed with the clerk, or an entry thereof upon the records of the court."

See, also, *Rich v. State Nat. Bank,* 7 Neb. 201; *German-American Ins. Co. v. Buckstaff,* 38 Neb. 135, 56 N. W. 692; *Anderson v. Walsh,* 109 Neb. 759, 192 N. W. 328.

A number of other conversations on this subject were admittedly held between the representative of the Altitude Petroleum Company and the respondent, but lapse of time has necessarily created a lapse of memory on the part of all concerned.

The state's witness testified as follows: "Q. Now, did you later have any conversation with Mr. Bachelor about it? A. Well, it was on the—there was several occasions from that time on until May. I can recall the next to the last and the last occasions, but I don't recall the times in between except that I have a recollection of having gone to see him "

There is no evidence in the record as to the actual amount of gasoline on hand at the time of this oral agreement. We have no proof of the amount of unpaid gasoline tax referred to. We do not know how much money net the Fair Price Oil Company may have received when it sold the gasoline, but the undisputed evidence is that the amount realized therefrom was applied upon its indebtedness, and that Bachelor personally received no part thereof. There is evidence in the record that, after the affairs of the Fair Price Oil Company had been liquidated and its assets exhausted, Mr. Bachelor, personally, orally assumed the duty of making a settlement of the amount due to the Altitude Petroleum Company on account of the gasoline supposedly on hand, out of the proceeds of a certain Michigan real estate mortgage (his own private property) which he hoped to collect, but which subsequently proved uncollectible.

The evidence in this record is silent as to any concealment of facts on the part of Bachelor, or of any absence from this jurisdiction by him. Admittedly no attempt to enforce the claim of the Altitude Petroleum Company other than shown herein has been made as against Bachelor. In this connection there is an unexplained silence of more than seven years. No reason is claimed or shown as to why this matter was not presented to this court promptly, or within a reasonable time, where, in the natural course of events, competent testimony that once must have existed would have been available to have fully disclosed the entire transaction.

Without special reliance upon any of the provisions of our statute of limitations as applicable, but from the entire record, it is obvious that there has been such a natural

impairment of evidence by the effect of passing time that justice and good government will not be furthered or promoted by further consideration of this charge. It is, therefore, considered and adjudged that the same be dismissed with prejudice.

The seventh count of the complaint is based upon the claim "That in March, 1934, one John Dike was a tenant on certain real estate in Frontier county, Nebraska, owned by one R. R. Reed and one E. C. Aegerter; that some rent being in arrears, and suit for possession of the land being threatened, the said Dike employed respondent as his attorney, and gave to him the amount of $125 for the purpose of tender of that amount to the said landlords; * * * that the respondent herein never in fact made said tender as required by his employment but appropriated all of said money to his own use, except the sum of about $35 * * *." The respondent joined issue upon the foregoing allegations.

Upon the evidence adduced the referee, in effect, concludes that the respondent in this transaction is guilty of unprofessional conduct as charged, and that the offense involves moral turpitude.

As to the exact nature and extent of this Frontier county litigation and the factual issues connected therewith, the present record affords us little information. It arose out of the provisions of a certain lease of agricultural lands in Frontier county, Nebraska. The lease is not in evidence, its duration does not appear, the property covered by the instrument is not described with certainty, and the contention of the parties to the litigation are, as set forth in the testimony, indefinite. As to Dike's obligation to pay rent, his testimony is, in part: "Well, I was supposed to give $250 a year but with permission of Dr. Reed (a co-owner and lessor) I was allowed to subrent half." This Dr. Reed, testifying as to a reduction of rent to the sublessee, stated: "Well, I suppose the other tenant didn't pay as much. Of course, the lease was made out to Mr. Dike for so much for the pasture rent. He couldn't handle it all.

The other tenant paid direct to me, but it was really up to him (Dike) to see it was paid." Further, "Q. (By attorney for State) In other words, you let the other man pay whatever he wanted because you were looking to Dike? A. Well, the lease was made to him; didn't feel like making any concessions when we had to get him off." Dike, on direct examination, testified that in 1934 he was a tenant on Dr. Reed's farm in Frontier county, and that he became involved in some litigation with the owners of the farm. He further testifies: "I got behind a little in my rent. Some other folks wanted the place; I couldn't find a place so I offered to pay," but an action was commenced against him apparently for possession, and he employed Bachelor as his attorney, no definite compensation being agreed upon. His evidence is that his attorney and himself discussed the proposition about making an offer of settlement, and an attempt to secure a settlement by the attorney was expressly authorized. Dike's testimony is, "He (Bachelor) asked me if I had made a legal tender. I asked him how he meant it, legal tender; he said present the cash; I said no, I had promised Dr. Reed to pay him two year's cash money; he had refused. Mr. Bachelor said, 'You give me the money and I will go and make a cash tender.' * * * Well, I gave him a check for $125. In the meantime Dr. Reed had reduced the rent to the neighbor. The other part of the pasture was $70. Bachelor said it wasn't right to charge one $70 and the other $125. He said, 'If he won't take $70, I will give him $125.' " This answer is reiterated in the following testimony: "Q. What did you say and what did he (Bachelor) say? A. Well, I said I was willing to pay my rent; I was wanting to pay the $125. He says, 'No, that isn't fair to charge one extra and the other $125.' I said, 'I can't get a place; I want to stay; I am willing to pay my rent.' He said, 'I will offer him $70; if he won't take it I will give him $125.' He offered him $70; of course they refused."

The entire record, in connection with the surrounding circumstances of the respective parties, establish that the

facts testified to by Dike constituted a clear agreement that the formal tender of $70 should be made by Bachelor, that it should be kept good by him, and the $55 remaining should be retained by Bachelor to enable him, if possible, to secure and complete a settlement with the landlords on the basis of the payment of the $125 in cash. As to a time limit for performance, the parties agreed upon no definite period, except possibly there is implied a limitation fixed by the final determination of the litigation to recover possession of the occupied premises from Dike, then pending, or shortly to be commenced, which might render further retention of these moneys by Bachelor unnecessary. But until that condition came into existence Bachelor's retention of the funds, under the terms of that understanding, would not involve any violation of his duties as an attorney, and would not, at least *prima facie*, involve any lack of loyalty to his client. There is no question that the tender of the $70 was promptly made by Bachelor to Reed, and that for the purpose of "keeping it good" that amount was deposited with the McCook National Bank, as contemplated by all the parties. Indeed, there is evidence in the record that this deposit in the bank was made in the presence of both of these parties. Some time later this amount was withdrawn from such bank by or in the presence of Dike and Bachelor, and undisputed evidence in the record appears to be that, after such withdrawal, Bachelor and Dike together appeared at the office of Dr. E. T. Molzahn and requested permission to deposit this sum of $70 with him in his safe. The doctor placed or caused this money to be placed in an envelope on which was indorsed a memorandum of the transaction, which together were placed in his safe, and which money was retained by Molzahn for a considerable period of time. Finally, Mr. Dike and Mr. Bachelor appeared together and requested that the money be turned over to them and it was then turned over to Mr. Bachelor and Mr. Dike. The record does not contain any reason for transfer of the money from the bank to the safe of a private individual. However, this court will take judicial no-

tice of the enactment of chapters 16, 17 and 65, Laws 1933, as well as the general conditions existing which, by that legislation, were sought to be remedied. Therefore, on the basis of the testimony presented by the state in support of this count seven, we find no failure on the part of the accused to perform all required acts relative to a legal tender of money entrusted to him by his client for that purpose. But it is agreed on part of all that the tender thus made was not accepted.

The determination of this question of tender, as well as the final conclusion of the litigation with which it was connected, leaves only for our consideration that part of count seven which sets forth that the respondent "appropriated all of said money ($125) to his own use, except the sum of about $35." It will be noted that when the Frontier county litigation had been finally terminated all moneys in the hands of Bachelor or under his control, held for the purpose of making tender or securing a settlement, ceased to have impressed upon them the characteristics of funds held for a special purpose. To the extent of his reasonable charges and disbursements, respondent was entitled to an attorney's lien thereon, as "upon money in his hands belonging to his client." Comp. St. 1929, sec. 7-108. See *Van Etten v. State*, 24 Neb. 734, 40 N. W. 289.

Entitled to full credit for his reasonable charges and disbursements upon the $125 here in dispute, the fundamental question is, did Bachelor overcharge his client Dike in 1934 or the early months of 1935? The evidence upon which the facts are to be determined is entirely oral, and was first produced on trial in January, 1940, in a proceeding first begun in August, 1939. But in its case in chief the state, over objections, was permitted to introduce proof in support of this seventh count that Dike had paid Bachelor $10 on March 27, 1934, and $20 on May 4, 1934. If we assume that these payments, so testified to, were intended by the payer to be applied on attorney fees and disbursements made in the Frontier county cases, which fact it was the state's evident purpose to establish, they, in effect, in-

creased respondent's accountability under count seven of the complaint from the $125 alleged to $155 at the time of trial. These two payments are not covered by the pleading of the state, nor embraced therein. This amounted to a denial of due process to respondent, as he was compelled thereby to meet charges not included in count seven. At least it must be conceded that the proper application of the principle as to *"allegata et probata"* has been ignored. Under these circumstances, if the requirements of good pleading and ordinary rules of procedure are to be deemed waived in this proceeding, evidence tendered by Bachelor of other substantially contemporaneous employments by this client, in addition to the Frontier county cases, should be received and given due consideration, notwithstanding they may not be referred to in his written answer to the complaint.

Bachelor's contention is that a full settlement of this matter of his services to Dike was made, but his evidence, while not in effect retracting or negativing this claim, yet, due to lack of recollection of details, the weight of his testimony is seriously impaired. His proof, speaking generally, is certainly unsatisfactory, possibly due to a failing memory and lapse of time. This failure of memory seems to be exhibited not only by Bachelor, but by Dike also.

Taking up the subject of the $55 which Bachelor was permitted to retain for the purpose, if possible, of making a settlement, Bachelor testifies as follows: "The $55, if I received any portion of that $55, Mr. Dike has my receipt for it. Q. Just a minute here—I want this here; do you deny or admit you received that other $55? A. I don't even deny or admit. Q. You plead *nolo contendere* about getting that $55? A. No, sir; I say if I got any portion of that $55 Mr. Dike has my receipt."

On this subject, Dike testifies, in part, as follows: "Q. Now, did you ever get any part of your $125 back? A. I got some, yes; I don't know just the total. I got a $15 check; I got some $2 in cash, $5 in cash, $10 for rocking chair. Q. Just a minute—there was $15, $2 in cash, $5 in cash, $10

for a rocking chair? A. $4.35 for twenty five gallons of gas, $1.84 for ten gallons of gas, $1.83 for five gallons of gas; there were a few groceries; the Northup store that I haven't any account of, I don't know just what that was. * * * Q. You have testified to getting some groceries; how did that come about? A. Well, we were, of course, very hard up. I kept asking Mr. Bachelor for some money which I knew Dr. Reed had not got. He said, 'My credit is good at Northup's,' and I could get it charged to his account. I forgot how many we did get. Q. Was it enough to pay you? A. No; no, I don't think it was over three or four dollars at a time, and I don't believe over two or three times; I don't remember. Q. Would you say just nine or twelve dollars? A. Somewhere around there, it has been so long ago."

Witness Dike thus makes a dubious admission that he has actually received $52.02, or somewhere around there, on the $55 claim he now makes. As we have seen, it is Bachelor's contention that the $55 item was settled between the parties soon after the cashing of the $125 check in March, 1934; that the items amounting to $52.02 were advanced by him to his client, relying on the $70 of his client's moneys still on deposit as his security. But he also claims that these groceries so furnished by him amounted to between $15 and $20, which would raise the credit to which he is entitled on that score to from $55 to $60. We infer from the entire record that from $10 to $20 of the moneys received by Bachelor from his client was for court costs, and that the same *may* have been paid out by him for that purpose. Dike's evidence is positive that he personally paid but $4 for something which we may assume, without definite proof, to be for costs of litigation. We can take judicial notice that to institute an action of forcible detention in the county court, and try the same in that court, prosecute an appeal to the district court, keep it on the docket of the latter court for some eleven months approximately, and have it terminate with an order of dismissal, will inevitably subject the losing party to a burden of taxed costs. But here we have no reliable evidence as to the amount of these

costs as taxed, how much of the same, if any, was paid by Bachelor, or the actual amount thereof, if any, paid by Dike. The costs actually taxed and paid on these Frontier county cases, if material and relevant to the present proceeding, are a matter of public record, and, assuming the public officers involved have performed their statutory duties, should have been established by unimpeachable evidence. This was not done by either Dike or Bachelor.

Returning now to the payments or advancements admittedly made by Bachelor to Dike, it is obvious that without reference to the conflicting reasons and purposes for their having been made as claimed by these parties, these payments or advancements were actually made and Bachelor is entitled to credit therefor. This reduces the amount of Bachelor's accountability to $70. Against this sum he is entitled to have credited his reasonable charges and disbursements as attorney for Dike, made in the Frontier county cases. These services were not performed in this court, and, as to proof of the extent, nature and value thereof, we are limited to the record before us.

It appears that, after the recital of certain facts pertaining to the duties performed by him in connection with the Frontier county cases, Bachelor gave the following testimony: "Q. Do you have an opinion what the fair and reasonable value of the legal services you rendered Mr. Dike? A. Yes. * * * A. At least $100. Q. And in your answer you claim that you have had a settlement with Mr. Dike; is that true? A. Yes, sir. Q. And did you settle on an agreed basis; reach an agreement which he accepted? A. He accepted it. Q. And so far as you know the transaction was closed, was it not? A. Absolutely. Q. When the settlement was made it was satisfactory to both yourself and Mr. Dike, so far as you know? A. So far as I know. Q. And did he acknowledge it was in full satisfaction? A. He did; to the best of my recollection, I got a receipt, but I haven't had time to go through those. The receipt was given to me when I was out of the office; I haven't gone through those files, but I think some place I have got a receipt. Q. You never

got any money from Mr. Dike to cover your costs that you have testified to, your expenses, your attorney's fees, and advances which have been testified to by Mr. Dike other than the—what was paid in the payments made by Mr. Dike of $125, $10 and $20? A. No; that was all. Q. Just to clear up one thing; how long did Mr. Dike stay on that place after the forcible entry and detainer action was started? * * * A. He stayed until the next year; I think it was about a year or a little more, but I kept him on the place. He moved off—he moved off before the case was finally determined in the district court. * * * Q When this settlement was made, it was your understanding it was a final settlement of that entire transaction? A. It was a final settlement; yes."

Dike was not recalled after this testimony was given and this proof as to the final settlement stands undenied in the record. It must be conceded that the attorney himself is a competent witness to prove the value of his services performed.

There is also testimony in the record on the subject of the value of the services performed from Lafayette D. Hurley. This witness is an attorney at law. He occupied the same law office with Bachelor during the pendency of the Frontier county cases. He witnessed the office work and office consultation with the client Dike and knew of course the absences from his office by respondent in connection therewith, and the general nature of the services performed. He testified as follows:

"Q. From your own professional knowledge, have you an estimate of the value of Mr. Bachelor's services in that connection? * * * Q. Have you such an opinion? A. I have. Q. Will you state what your opinion is as to the value of Mr. Bachelor's services in the Dike case? A. $150 for the services that he performed in that case."

While this evidence as to value is not necessarily binding on this court, it is competent and for our consideration. There is no other expert evidence in the record on this subject and the evidence, if believed, fully and properly accounts for the entire $125 he is alleged to have misappro-

priated. Indeed, it also includes the additional $30 which was paid him in connection therewith. This is not in the nature of an action to recover back compensation paid to an attorney Even if so considered, the general rules as to the recovering back of payments made apply to the recovery by a client of fees paid by him to an attorney. It seems in the absence of fraud a client cannot recover a fee voluntarily paid for services fully performed, the beneficial results of which he has received and accepted. It would seem unjust that a bar committee should be permitted to question what is binding upon the client. There is no evidence that Dike ever sought to recover from Bachelor, by legal proceeding, any portion of the fund now claimed, though it must be conceded that to a judgment, if one were obtained based on this claim, there would be no exemptions thereto. Comp. St. 1929, sec. 20-1558.

Bachelor was born on the 22d day of July, 1863; has practiced law since May 21, 1891; and the undisputed evidence is that previous to the filing of the present charges he has never been charged with unprofessional conduct, nor with the commission of a crime. In view of the entire record, we find that the accused is not guilty of the offense charged in count seven, nor guilty of any moral turpitude in connection therewith.

It is, therefore, considered by this court that those parts of the report of the referee in this case wherein it is determined that Bachelor is not guilty of the charges contained in counts three, four, six, eight and nine of the complaint filed herein be, and the same hereby are, approved and confirmed; that the parts of such report wherein Bachelor is adjudged guilty of the offenses charged in counts one, two, five and seven of such information, and his conduct is criticized and questioned as to counts three and eight, be, and hereby are, disapproved and set aside, and as to each of said counts one, two, five and seven, said Bachelor, upon the record before us, is adjudged not guilty.

The motion for his disbarment is, therefore, denied.

JUDGMENT FOR RESPONDENT.

JOHNSEN, J., not participating.