STATE OF NEBRASKA EX REL. NEBRASKA STATE BAR ASSOCIATION, RELATOR, v. EVERETT O. RICHARDS, RESPONDENT.

84 N. W. 2d 136

Filed July, 12, 1957. No. 33989.

*Clarence S. Beck,* Attorney General, and *Charles E. McCarl,* for relator.

*Edward E. Carr* and *Baskins & Baskins,* for respondent.

Heard before SIMMONS, C. J., MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

WENKE, J.

This is a disciplinary proceeding against Everett O. Richards. It was first presented to and considered by the Committee in Inquiry for the Thirteenth Judicial District, that being the judicial district wherein Everett O. Richards resides. Thereafter it was considered by the Advisory Committee for the Nebraska State Bar Association, the latter having filed the original complaint in this court. After a demurrer was sustained to the original complaint the Attorney General filed an amended complaint setting forth charges in addition to those contained in the complaint filed by the Advisory Committee. Such procedure is in accordance with Article XI, Investigation and Disposition of Charges, of the Rules Creating, Controlling and Regulating Nebraska State Bar Association. See, sections 3, 5, 7, 8, 11, and 12, of Article XI thereof.

In the amended complaint the Attorney General alleges that Richards has been guilty of unprofessional conduct in the practice of law and of conduct which was in violation of the canons of Professional Ethics of the profession of law, thereafter setting forth in detail the

conduct of Richards which it is claimed was unprofessional and in violation of such canons. In view thereof he asks, on behalf of the Nebraska State Bar Association, that this court enter an order for such discipline against Richards as it may deem reasonable and proper. Richards filed an answer to this amended complaint wherein he raised issues of fact and, based thereon, asked that the amended complaint be dismissed. We thereupon appointed a referee. See part III, § 7, Disciplinary Proceedings, of the Revised Rules of the Supreme Court.

The referee arranged for and had a hearing. He thereafter made a written report to this court setting forth the facts as he found them to be and, based thereon, recommended that some disciplinary action be taken. Richards filed exceptions to the referee's report. The question thus presented is, was Richards guilty of unprofessional conduct in his practice of the law and, if so, should he be disciplined because thereof and to what extent?

"A duty rests on the courts to maintain the integrity of the legal profession by disbarring lawyers who indulge in practices designed to bring the courts or the profession into disrepute, or to perpetrate a fraud on the courts, or to corrupt and defeat the administration of justice." State ex rel. Nebraska State Bar Assn. v. Wiebusch, 153 Neb. 583, 45 N. W. 2d 583. See, also, 7 C. J. S., Attorney and Client, § 34, p. 793.

"Any conduct on the part of an attorney evidencing his unfitness for the confidence and trust which attend the relationship of attorney and client or unworthy of public confidence constitutes a ground for suspension or disbarment." 7 C. J. S., Attorney and Client, § 19, p. 733. See, also, State ex rel. Nebraska State Bar Assn. v. Wiebusch, *supra*.

"The purpose of a disbarment proceeding is not so much to punish the lawyer as it is to determine in the public interest whether he should be permitted to

practice." State ex rel. Nebraska State Bar Assn. v. Wiebusch, *supra.*

Everett O. Richards, also referred to in the record as E. O. Richards and whom we shall herein refer to as either Richards or respondent, was admitted to the practice of law in Nebraska on November 8, 1939, and has, at all times since then, been legally qualified to do so. He commenced the practice of law at Chappell in Deuel County, Nebraska, on November 15, 1939, and has engaged in the practice at that place ever since.

"In granting a license to practice law it is on the implied understanding that the party receiving it shall in all things demean himself in a proper manner, and abstain from such practices as cannot fail to bring discredit upon himself, the profession, and the courts." State ex rel. Attorney General v. Burr, 19 Neb. 593, 28 N. W. 261. See, also, State v. Fisher, 103 Neb. 736, 174 N. W. 320; State ex rel. Nebraska State Bar Assn. v. Wiebusch, *supra.*

" 'An attorney, as an officer of this court, must so conduct himself as to assist in maintaining confidence in the integrity and impartiality of the court.' State ex rel. Sorensen v. Goldman, 127 Neb. 340, 255 N. W. 32." State ex rel. Nebraska State Bar Assn. v. Wiebusch, *supra.*

Section 7-104, R. R. S. 1943, provides the oath every person must take and subscribe upon being admitted to practice by this court. In State ex rel. Nebraska State Bar Assn. v. Wiebusch, *supra,* we said: "Such an oath requires lawyers to faithfully discharge their duties, uphold and obey the Constitution and laws of this state, observe established standards and codes of professional ethics and honor, maintain the respect due to courts of justice, and abstain from all offensive practices which cast reproach on the courts and the bar."

Proceedings for the discipline of attorneys are considered civil in their nature. See, part III, § 1, Disciplinary Proceedings, of the Revised Rules of the Su-

preme Court; State ex rel. Nebraska State Bar Assn. v. Bachelor, 139 Neb. 253, 297 N. W. 138.

As to an attorney's rights we said in State ex rel. Nebraska State Bar Assn. v. Bachelor, *supra*: "'The attorney and counselor being, by the solemn judicial act of the court, clothed with his office, does not hold it as a matter of grace and favor. The right which it confers upon him to appear for suitors, and to argue causes, is something more than a mere indulgence, revocable at the pleasure of the court, or at the command of the legislature. It is a right of which he can only be deprived by the judgment of the court, for moral or professional delinquency.' Ex parte Garland, supra (4 Wall. (U. S.) 333)."

In State ex rel. Nebraska State Bar Assn. v. Pinkett, 157 Neb. 509, 60 N. W. 2d 641, we said: "In a proceeding for the disbarment of an attorney at law the presumption of innocence applies, and the charge made against him must be established by a clear preponderance of the evidence." See, also, State ex rel. Nebraska State Bar Assn. v. Bachelor, *supra.*

In this respect we said in State ex rel. Nebraska State Bar Assn. v. Gudmundsen, 145 Neb. 324, 16 N. W. 2d 474: "* * * the findings to sustain disbarment must be sustained by a higher degree of proof than that required in civil actions, yet falling short of the proof required to sustain a conviction in a criminal action." And therein we went on to say: "* * * the finding in a civil action that an attorney at law has been guilty of conduct justifying disbarment is not conclusive on the same question when presented for determination in an action for disbarment; * * *."

In the Rules Creating, Controlling and Regulating Nebraska State Bar Association it is provided by Article X thereof as to professional conduct that: "The ethical standards relating to the practice of law in this state shall be the canons of Professional Ethics of the American Bar Association, including the additions and amend-

ments as of January 1, 1945, thereto, and those which may from time to time be approved by the Supreme Court."

The preamble of the Canons of Professional Ethics, American Bar Association, provides: "In America, where the stability of Courts and of all departments of government rests upon the approval of the people, it is peculiarly essential that the system for establishing and dispensing Justice be developed to a high point of efficiency and so maintained that the public shall have absolute confidence in the integrity and impartiality of its administration. The future of the Republic, to a great extent, depends upon our maintenance of Justice pure and unsullied. It cannot be so maintained unless the conduct and the motives of the members of our profession are such as to merit the approval of all just men."

Canon 29, Canons of Professional Ethics, American Bar Association, which deals with the subject of Upholding the Honor of the Profession, provides in part: "He should strive at all times to uphold the honor and to maintain the dignity of the profession and to improve not only the law but the administration of justice."

In State ex rel. Nebraska State Bar Assn. v. Wiebusch, *supra,* we said: " 'Violation of codes of ethics or any conduct on the part of an attorney in his professional capacity which tends to bring reproach on the legal profession constitutes ground for suspension or disbarment.' (7 C. J. S., Attorney and Client, § 23, p. 741.) "

Count II of the Attorney General's charges relates to Richards' handling of certain matters in the estate of Amanda Forsythe, deceased, as it was administered in the county court of Deuel County, Nebraska. Amanda Forsythe died intestate on November 9, 1942, a resident of Deuel County and left as her only heirs at law two granddaughters living in or near Fremont, Nebraska. They were Ester Marie Bamesberger and Thelma Amanda Peterson, both of whom were then over 21 years of age. On November 10, 1942, these heirs executed and

then filed their petition, prepared by Richards, in the county court of Deuel County asking that the estate of the decedent be administered and that letters of administration be issued to E. O. Richards. Property left by the decedent was ultimately appraised as having a value of around $80,000. Because some of the assets needed immediate attention Richards was appointed and qualified as special administrator on November 17, 1942, and thereafter as regular administrator on December 3, 1942. Richards acted as his own attorney in handling the estate as the special and regular administrator thereof. No agreement was entered into nor was any understanding had between the heirs and Richards as to what his fee would be for handling the estate.

On January 2, 1943, Richards, without consulting the heirs and without their knowledge, applied to the county court for the allowance of partial administrator's and attorney's fees in this estate. Pursuant thereto, and on the same day, the county court allowed such fees in the sum of $6,000 and authorized the payment thereof, which the administrator did. Upon the discovery thereof by the heirs some months later, apparently from the contents of a letter written them by Richards on March 18, 1943, at their request, they came to Chappell with other counsel. As a result of a conference that was had between the parties Richards agreed to and did accept a total fee for handling the estate, both as administrator and counsel, of $2,000, refunding to the estate the balance of $4,000 of the partial fees allowed to himself. At the same time the heirs and Richards entered into a stipulation whereby they consented to having the application filed by Richards and the order of the court allowing the payment of partial administrator's and attorney's fees of $6,000 withdrawn from the files of the estate. Although this stipulation was not filed in the estate proceedings the then county judge testified he knew of the stipulation, and its contents, and agreed

thereto and permitted the two instruments to be withdrawn from the files and destroyed.

The amended complaint charges these actions by Richards in connection with this estate constituted an attempted perpetration of fraud as against the heirs of the deceased and a breach of trust and confidence as between the defendant as administrator and attorney for said estate and the heirs, and constitutes unprofessional conduct and is contrary to the Canons of Profession Ethics of the State of Nebraska.

As to the removal of the two instruments from the files of the estate with the court's knowledge and approval the following has application: "Judicial records or papers should not be removed from the office of the clerk or files where they belong except for good and sufficient reasons, and no person has a right to remove them without permission of the court. Ordinarily, papers before the court at the hearing of the cause may not be withdrawn from the records, even on application of both parties * * *. The court may, however, grant permission to remove papers from the records, this being a matter within the discretion of the court both as to the removal and as to the terms and conditions on which the permission shall be granted. * * * There may, nevertheless, be circumstances in which it is not only proper but the duty of the court to deny such an application." 21 C. J. S., Courts, § 228, p. 428.

And in section 229 of the same authority, page 430, dealing with a court's custody and control of its own records, it is stated that: "A court of record has general authority over its own records, and they are within its custody and control, particularly so far as they pertain to the court's business and so far as is essential to the proper administration of justice. * * * In exercising control over its records, a court has power to protect them from irrelevant, unimportant or superfluous papers, and to keep the records free from stain

and scandal not pertinent to the cause and unnecessary to the decision."

We think what was here done was, under the circumstances, within the discretion of the county court and that Richards was not remiss in his duties as an attorney when he entered into a stipulation with the heirs the effect of which was to ask the county court for permission to remove the two documents. They were not essential to a complete record of the estate proceedings. The same would be true of the claim filed by E. E. Richards, respondent's father, for a balance due in the sum of $487, which claim the county court permitted the claimant to withdraw.

As to what Richards did in obtaining the allowance of partial fees as administrator and attorney in the sum of $6,000 very shortly after he was appointed and qualified as administrator, without consulting the heirs when he had no agreement or understanding with them in regard thereto, and then, after they complained thereof, agreeing to a fee of $2,000 for all of his services in those two capacities, we think the following language from canon No. 11, Dealing with Trust Property, and from canon No. 12, Fixing the Amount of the Fee, Canons of Professional Ethics, American Bar Association, has application:

"The lawyer should refrain from any action whereby for his personal benefit or gain he abuses or takes advantage of the confidence reposed in him by his client.

"In fixing fees, lawyers should avoid charges which overestimate their advice and services, as well as those which undervalue them. * * * In fixing fees it should never be forgotton that the profession is a branch of the administration of justice and not a mere money-getting trade."

We think what respondent did in this respect indicates a greater interest in his personal financial welfare than in his professional conduct in relationship to both his clients and the court.

It is true that ordinarily the charging of an excessive fee is not ground for suspension or disbarment. 7 C. J. S., Attorney and Client, § 23b, p. 745. But it may be if the fee is clearly excessive. This incident occurred a number of years before any complaint was made in regard thereto but general statutes of limitation have no application to disciplinary proceedings. 7 C. J. S., Attorney and Client, § 25b, p. 766. However, staleness of a charge may be good cause for refusing to consider it. If this were the only matter herein involved we would not, after such a long period of time, consider it of sufficient importance to justify taking any action thereon except to reprimand respondent, particularly when it happened only a few years after respondent entered the practice. However, in view of what is hereinafter said about his conduct in connection with the Dryden estate, we shall take it into consideration in determining the extent of the discipline it is proper to impose.

Count III deals with the fact that respondent, while county attorney of Deuel County and while representing the administratrix of the estate of Fermon J. Grant, deceased, and also while representing the administratrix with the will annexed of the estate of Otto J. Melton, deceased, had an order entered in each estate determining and assessing the inheritance tax due and owing from said estate. It is contended that said acts are contrary to the Canons of Professional Ethics and subject to criticism. Admittedly respondent has, at all times since 1941, been the duly elected, qualified, and acting county attorney of Deuel County.

Fermon J. Grant died intestate, a resident of Deuel County. His estate was administered by the county court of that county. Velma Grant was appointed, qualified, and acted as administratrix thereof. Respondent represented her as attorney for which he received $2,745. The assets of the estate were appraised at $148,987.60. On May 31, 1952, respondent, as county attorney of Deuel County, John H. Pace, as county treas-

urer of Deuel County, and Velma Grant, as administratrix of the Melton estate, entered into a stipulation, subject to approval by the county judge of Deuel County, that the valuations placed on the assets of the estate as fixed by the appraisers, theretofore appointed by the court for that purpose, could be accepted as the true value thereof for the purposes of determining and assessing inheritance tax on the shares and interests of the beneficiaries thereof. On the same day the county judge, based on those values, determined there was due Deuel County from Velma Grant inheritance tax in the sum of $460.44 and from Louisa Grant in the sum of $487.76, which amounts he ordered the administratrix to retain from their respective shares and pay to the treasurer of Deuel County, which she did. It is apparent that respondent acted as attorney both for the administratrix of the estate and for Deuel County in the matter of determining and assessing the inheritance tax.

Otto J. Melton died testate. He was, at the time of his death, a resident of Cheyenne County, his estate being probated in that county. Nellie Melton, his widow, was appointed, qualified, and acted as administratrix with the will annexed of the estate, employing respondent as her attorney. Decedent was the owner of real and personal property appraised at $82,363.41, of which there was real estate located in Deuel County appraised at $16,440. On November 23, 1949, the county court of Cheyenne County determined and assessed the amount of inheritance tax due Deuel County to be in the sum of $92.95, the record showing that respondent had accepted that figure as a proper computation thereof on the Deuel County land. The tax assessed was paid.

There was no prohibition against respondent, because he was county attorney of Deuel County, from continuing in the private practice of law, which would include estates. However, canon No. 6, Canons of Professional Ethics, American Bar Association, provides that: "It

is unprofessional to represent conflicting interests, except by express consent of all concerned given after a full disclosure of the facts. Within the meaning of this canon, a lawyer represents conflicting interests when, in behalf of one client, it is his duty to contend for that which duty to another client requires him to oppose."

The consent clause in the canon has no application in the case of a public officer. Opinions 16, 34, and 77 of the Committee on Professional Ethics and Grievances of the American Bar Association.

It is the duty of the county attorney to prosecute and defend all civil suits, applications, or motions on behalf of the county and state which arise under the laws of the state and in which the county or state is a party or is interested. § 23-1201, R. R. S. 1943. This includes all matters involving the determination of inheritance tax. See Ch. 77, art. 20, R. R. S. 1943. This duty is now specifically set out in section 77-2018.03, R. S. Supp., 1955.

But respondent seems to rely on the fact that he did not act in either of these estates in regard to inheritance tax until after he had had a conference with the county commissioners of Deuel County and fully explained to them the situation therein and their right to appoint special counsel to handle the inheritance tax matter for the county. The record shows that in each estate the county commissioners, after checking the values placed on the property of the decedent by the appraisers appointed therein, decided the appraised values put on the property by the appraisers were the true values thereof and that it was not necessary to appoint special counsel. But, as we have already stated, the county commissioners could not waive respondent's duties in this regard. He was representing both the representative of the estate and the county and state when he appeared before the county court in respect thereto.

It is also brought out by the evidence adduced that no

one ever questioned the inheritance tax assessed; that no damage resulted therefrom; that the federal authorities used the same values for assessing federal estate tax; and that no fraud, deceit, or unscrupulous practice was involved. But for conduct to be unethical it is not necessary that some damage result therefrom because of fraud, deceit, or unscrupulous practice. As said in Opinion 49, of the Committee on Professional Ethics and Grievances of the American Bar Association, page 134: "An attorney should not only avoid impropriety but should avoid the appearance of impropriety." See, also, Opinion 77, of the Committee on Professional Ethics and Grievances of the American Bar Association, page 182. And, as stated in Opinion 34, of the Committee on Professional Ethics and Grievances of the American Bar Association, page 118: "* * * it is the duty of an attorney in public employ to be and remain above all suspicion, even at personal financial sacrifice."

This, and comparable situations, undoubtedly present difficult problems for county attorneys who have a private practice, as most of them have to in order to make a living in view of the low salaries paid for such office in most of the counties of the state. However, because of that fact, we cannot see fit to lower the ethical standards of the profession applicable thereto. In the situation here the problem could have been met, as it was in the Dryden estate hereinafter more fully discussed, by the appointment of special counsel to represent the county. What is the practical solution of the problem it is difficult to visualize. Every attorney, who is also a county attorney, will have to meet each individual situation as he is confronted with it in his private practice. If this was the only matter for our consideration herein we would only admonish respondent and advise him to be more careful in the future of his dual responsibility as long as he is the county attorney.

Count I of the amended complaint deals with three phases of respondent's conduct in the drawing of sev-

eral wills for Mary E. Dryden, who, while in her early 70's, died testate on October 9, 1950, while a resident of Deuel County, and in the handling of the probate of the last will thereof in the county court of that county. The first phase relates to respondent's relationship to the decedent during the drafting of several wills leading up to the last will she executed on January 9, 1950, which respondent drafted, wherein he was made the principal beneficiary of her estate and named as executor thereof. Decedent died possessed of an estate appraised at $86,-640.44. Under the terms of her last will respondent was given a cash bequest of $2,000 and a section of land appraised at $34,400, although apparently worth about $45,000. The second phase deals with respondent's handling of the probate of decedent's last will in the county court of Deuel County and his failure to fully perform all of his duties as they related to the only heirs at law of decedent who, at that time, lived in Seattle, Washington. They are her grandniece Patricia Jean Kerton (now Johnson, as she married Robert C. Johnson in 1951), and a grandnephew Lester Francis Kerton. The third phase deals with respondent's failure to pay interest on the inheritance tax levied and assessed by the county court against the share of the estate he received under the last will of decedent. We shall discuss these phases in the order herein enumerated.

We do not think respondent was guilty of unethical conduct merely because he drafted a client's will containing a provision therein whereby he became a beneficiary of a part of her estate when, as the record here shows, she insisted he do so. See, Matter of Wharton, 270 App. Div. 670, 62 N. Y. Supp. 2d 169; Tarr v. Vivian, 272 Mass. 150, 172 N. E. 257; Matter of Will of Smith, 95 N. Y. 516; In re Bottier's Estate, 106 N. J. Eq. 226, 150 A. 786. Attorneys for clients who wish to leave them or their families a bequest or devise of part of their property, which they have a perfect right to do, will do well to have the will drawn by some other

lawyer. But if a client insists on having his or her attorney draft a will containing such a provision we can see no reason why the attorney should refuse to do so and thereby defeat his client's wishes. However, when such is the case the attorney's responsibilities to the heirs at law are much greater and, become increasingly so, when he is also named in such will as the executor thereof and later acts as attorney in relation to the probate thereof.

The evidence shows that respondent had been acquainted with decedent some 10 to 12 years; that commencing about 1946 or 1947 the acquaintanceship became a social relationship; that during the last years of decedent's life the social relationship became a very close personal friendship; that commencing in February 1945 respondent became decedent's attorney; and that he continued to be such up to the time of her death, she having considerable need for legal service in connection with her property. Respondent drafted and decedent executed a series of wills the first of which was dated October 4, 1945. At that time she had a sister by the name of Araminta Jensen living in Seattle, Washington, who died on December 16, 1949. Patricia Jean Johnson and Lester Francis Kerton are grandchildren of Araminta Jensen, deceased. During the period between the date of this first will and her last will dated January 9, 1950, decedent had five other wills drafted, thus making a total of seven. In the third of these wills, dated September 3, 1947, respondent was named as executor as he was in all wills she executed thereafter. In the fifth of these wills, dated March 5, 1949, he was bequeathed the sum of $2,000, as he was in all the wills she executed thereafter, and in her last will, executed January 9, 1950, respondent was given the section of land already referred to.

Respondent offered a great deal of evidence to show the close friendship between decedent and respondent's family; her mental condition at the time she executed

her last will and up to the time of her death; the reason why decedent changed her wills so often and made different people the beneficiaries of her estate, as evidenced by the wills she had drafted; and the fact that she had informed others that she was going to give respondent some of her property. He also did the same regarding the preparation, execution, and handling of her last will. This was apparently done in order to show that decedent had mental capacity to make the will; that the respondent did not exercise any fraud, deceit, duress, or any other improper influences on her in order to induce her to put the provisions therein in his favor; and to overcome any presumptions of fraud or undue influence that might arise because of the relationship existing between the parties. However, we cannot overlook the fact, and we think it is significent, that after our opinion was released on April 4, 1952 (Johnson v. Richards, 155 Neb. 552, 52 N. W. 2d 737), mandate issued pursuant thereto on April 30, 1952, and the order admitting and allowing the last will of decedent to probate set aside by the district court for Deuel County on April 23, 1953, after a hearing on the petition filed by the heirs of decedent for that purpose, that respondent, while a trial commencing April 13, 1954, was being held on the objections of the heirs, did, on April 23, 1954, settle the contest by paying the heirs $33,000 in order to get them to withdraw their objections and permit the will to be allowed and admitted to probate, which it was.

After decedent passed away Leta Ellen Koier, a first cousin and then of Excelsior Springs, Missouri, filed a petition, prepared by respondent, in the county court of Deuel County asking that decedent's last will, dated January 9, 1950, be allowed and admitted to probate and that administration thereof be granted to respondent, who was nominated in the will as executor. Both Patricia Jean Kerton and Lester Francis Kerton were named in said petition although their address was not

set out therein until October 24 or 25, 1950, when it was inserted by respondent. Hearing thereon was set by the county court at 10 a. m. on November 3, 1950, and notice, as required by statute, was published advising thereof. On November 3, 1950, the last will was proved and thereupon allowed and admitted to probate and respondent was appointed, qualified, and acted as executor thereof. This is the order we have already referred to herein as having been set aside subsequent to our opinion and mandate issued pursuant thereto.

The evidence shows that at the time Mary E. Dryden died, and when her last will was offered for probate in the county court of Deuel County by Leta Ellen Koier, the Kertons lived at 209 West 46th Street in Seattle, Washington. The Kertons' parents separated when Patricia, who is about 1 year younger than her brother, was about 3 years old. Thereafter Patricia and her brother went to live with their father's mother, who, at all times herein material, lived at 209 West 46th Street in Seattle. Araminta Jensen, sister of decedent Mary E. Dryden, was the grandmother of the Kerton children on the mother's side. She lived at 627 West 79th Street in Seattle. The mother died in either 1943 or 1944. Grandmother Jensen died on December 16, 1949. Neither of the Kerton children had even been in Nebraska prior to decedent's passing away. They first became acquainted with their grandaunt when she visited her sister in Seattle about 1940 or 1941. Patricia was then about 12 or 13 years of age. They renewed that acquaintanceship in the fall, October to December, 1945 when decendent again visited her sister. This latter visit in Seattle extended into May 1946, but after December 1945 decedent stayed with a Mrs. Harriette M. Bond at 617 West 79th Street in Seattle as decedent had had some difficulties with her sister.

The evidence shows that the first Patricia Jean Kerton learned of the death of decedent was when she returned to her home in Seattle on November 1, 1950,

from a vacation she had been on since October 12, 1950. At that time she received two letters, one from Leta Koier, whom she did not know, dated October 12, 1950, and one from respondent, whom she did not know, dated October 27, 1950. The letter from Leta Koier advised both her and Lester that their Aunt Mary had passed away the preceding Monday morning, October 9, 1950. Therein Leta Koier advised she was a cousin of the decedent but said nothing about her will or what was being done in regard thereto. On October 27, 1950, respondent sent a letter to Patricia Kerton at 209 West 46th Street in Seattle, therein advising her as follows: "Mary E. Dryden passed away October 9th and in-as-much as you are one of the devisees in her will I am enclosing a copy of said will. Miss Dryden's will is now in the process of probation in the County Court here. * * * P. S. I have the same address for Lester Francis Kerton, Jr., and am enclosing a copy for him, will you please see that he receives it." He enclosed two copies of the will therein referred to. He did not therein advise the Kertons they were heirs at law of the decedent. At the time Lester Kerton was at sea and did not return until about the middle of January 1951. Patricia Kerton replied to respondent's letter on November 1, 1950. In her letter she asked for information about the grand piano she had been bequeathed by the provisions of the last will of her grandaunt, then went on to say, "Any information that you might be able to give, I would appreciate if you would mail to me at my place of employment * * *." Respondent said he construed the quoted request for information as referring to the grand piano and since he did not have a key to the house where it was located, that being in the possession of Leta Koier to whom it had been devised, he could not and did not send her the information. The fact is the only information that respondent ever sent either of the sole and only heirs at law of decedent was

the letter of October 27, 1950, which we have herein-before quoted.

When Patricia Jean Kerton received respondent's letter on November 1, 1950, she was not aware of the fact that she and her brother were her grandaunt's closest blood relatives, as she was not acquainted with decedent's entire family. After her brother returned from sea, and they had obtained more information about the matter, they filed a petition in the county court of Deuel County on March 8, 1951, to set aside the order admitting and allowing the last will of decedent to probate and, at the same time, filed objections to the allowance of the will to probate. What happened in regard thereto has already been fully set out herein.

Under this factual situation we think the following from Johnson v. Richards, *supra*, has application in relation to respondent's duties and responsibilities to the heirs at law of decedent:

"It is unnecessary in this case to consider what the duty of Richards was, if any, in reference to appellants (the Kertons) before he volunteered to give partial information to them by his letter of October 27, 1950. But when he broke his silence he became obligated to truthfully and completely state the facts within the limits of his information and knowledge in regard to the subjects referred to by his letter and enclosure transmitted with it, and not to withhold or distort anything that would tend to cause appellants to remain inactive.

"Though one may be under no duty to speak, if he undertakes to do so, he must tell the truth and not suppress facts within his knowledge or materially qualify them. Fraudulent representations may consist of half-truths calculated to deceive, and a representation literally true is fraudulent if used to create an impression substantially false."

It is apparent that respondent sought, by his testimony, to avoid some of these responsibilities by alibis. Appellant testified he did not put the date of hearing set by the

county court for the hearing on the petition to allow and admit the last will of decedent to probate in his letter of October 27, 1950, for the reason that it was his understanding, and he thought, Leta Koier was going to do so in her letter to the Kertons advising them of decedent's death. Leta Koier does not testify to any such understanding and, in fact, her letter was written the day before the petition for probate was filed and at a time when she could not have known what date the county court would set for that purpose. We do not think respondent had any such understanding with Leta Koier but, even if he did, he would still be responsible for her failure to do so. He could not shift his responsibility to another in this respect and claim immunity when the other party failed to carry out such responsibility.

Respondent says he did not write the Kertons prior to his return from the Grand Lodge sessions of the Odd Fellows, of which he was then an officer, because he did not have their address and did not obtain it until after he returned when he obtained it from Leta Koier. Respondent apparently left Chappel very shortly after filing the petition for probate in the county court of Deuel County on October 13, 1950, to attend the annual session of the Odd Fellows already referred to and did not return for some 10 days. It appears that the Kertons' address appeared in one of the previous wills respondent had drafted, of which he had a copy in his office. It would appear respondent must have given very little, if any, thought to this matter for the Kertons' address could have easily been obtained by him from records in his own office. Respondent further states that he did not know until after November 3, 1950, that the Kertons were the only heirs of decedent, being until then of the impression that first cousins, of whom decedent apparently had several, would be of equal status as heirs as grandnieces and grandnephews. He testified that on or about October 27, 1950, he sent all first cousins, from a list furnished by Leta Koier, a copy of the will. It is

significant that he did not list such cousins in the petition for probate, which he prepared and which contains the following language: "And your petitioner further shows that the names, ages and residences of the heirs at law of said deceased, and other persons interested in said estate are as follows: * * *." While we think respondent, in handling the estate, was bound to know who would be the heirs at law of said decedent by reason of their blood relationship to her, however, we do not think this point material as it relates to respondent's knowledge for he knew the Kertons were heirs at law and when he engaged in giving them information he was bound by the same duties and responsibilities even though they did not constitute all the heirs at law.

We think the status of respondent required him, when he wrote the Kertons, to make a full disclosure of all facts within his knowledge which were material for them to know for the protection of their interests. His default in this respect, under all of the circumstances here established, constituted a breach of his trust as an attorney. See Johnson v. Richards, *supra*. It is apparent he was more concerned in making secure his rights under the will than he was of performing his duty as an attorney.

After the contest of the will was settled, and it was allowed and admitted to probate, the county commissioners of Deuel County on June 7, 1954, at the suggestion of respondent, appointed John D. Wertz, a practicing attorney at Chappell, as special counsel for the purpose of representing Deuel County and State of Nebraska in connection with the determination of the inheritance tax to be assessed in the estate of Mary E. Dryden, deceased. Thereafter, on July 26, 1954, Wertz entered into a stipulation with respondent as executor of the Dryden estate that, with his approval, the county judge could use the valuations placed on the assets of the estate by the appraisers thereof as the true value thereof for the purpose of determining and assessing inheritance tax

on the shares and interests of the beneficiaries thereof. On the following day, at the request of respondent, the county judge did so, fixing the amount thereof on the share of respondent as $4,335. However, the county judge charged no interest thereon because, as he testified, the delay was not caused by the executor or his attorney. Respondent immediately paid the amount thereof. Wertz took no appeal therefrom in behalf of the county, as he had a right to do. § 77-2023, R. S. Supp., 1955; Kearney County v. Hapeman, 102 Neb. 550, 167 N. W. 792. The charge against respondent is that he did not pay interest on this amount when he was clearly obligated to do so by the statute.

The county court of Deuel County had jurisdiction to determine and assess inheritance tax on the shares of the beneficiaries of decedent's estate (section 77-2027, R. R. S. 1943), could fix the values of the property without appointing special appraisers for that purpose (section 77-2021, R. R. S. 1943), and could therefrom determine the tax that was owing (section 77-2022, R. R. S. 1943). Proceedings for that purpose can be initiated, as was here done, by application of the executor. § 77-2018.01, R. S. Supp., 1955. The tax assessed is due and payable at the death of the decedent and draws interest unless, prior to August 27, 1951, it was paid within 12 months and since then within 16 months. § 77-2010, R. R. S. 1943, now § 77-2010, R. S. Supp., 1955. There was no basis for the county judge refusing to charge interest thereon as the 16 months leeway provided for in section 77-2010, R. S. Supp., 1955, had passed when respondent, as executor, made application to have the inheritance tax determined and assessed on July 27, 1954. The mere fact that delay had been caused by litigation did not excuse the county judge from assessing it. In re Estate of Sanford, 90 Neb. 410, 133 N. W. 870, 45 L. R. A. N. S. 228; In re Estate of Fort, 117 Neb. 854, 223 N. W. 633.

While it is apparent the then county judge failed to

properly perform his duty in this regard and that special counsel appointed by the county commissioners failed to properly look after the county's and state's best interests by failing to appeal from the county court's order determining and assessing the tax, we do not think such failure and neglect can be properly charged to respondent. Clearly he was relieved of his responsibilities to the county and state in this matter when Wertz was appointed. Likewise it was not his duty to appeal from the county court's decision nor did he have the responsibility of paying such interest when it was not charged to him by the county court. We can see nothing unethical in what respondent did in regard to this matter.

Having come to the conclusion that respondent's conduct requires that he be disciplined we come to the question as to the extent thereof based on the record before us. Respondent introduced the evidence of a number of prominent residents of Chappell to the effect that his reputation for honesty and integrity as a lawyer in that community was good and has not changed since the Dryden will contest. These witnesses, while mostly close friends or clients of respondent, are, nevertheless, representative of the community's interests. Recognizing the seriousness of disbarment to an attorney of the age of respondent (48) and the probable effect it could ultimately have upon his ability to earn a livelihood, we think this evidence of his reputation and integrity as a lawyer in a community where he has practiced law for many years should be given consideration in determining the extent of discipline that should be imposed. In re Petersen, 208 Cal. 42, 280 P. 124; People v. McCallum, 341 Ill. 578, 173 N. E. 827. However, as stated in State ex rel. Nebraska State Bar Assn. v. Gudmundsen, *supra*: "It may well be said that the reputation of a man in his community is usually a good indication of character but this is not always so." Whether or not the reputation of an attorney is of material importance in any discipline case must necessarily depend

largely upon the facts and circumstances thereof.

We think, under all of the circumstances as herein detailed, that a judgment of suspension from the right to practice law for a period of one year will adequately punish respondent for the offenses against the proper ethics of the profession which, by his conduct herein set forth, he has committed. Respondent should fully understand that he must strictly comply with this order and, if he should fail to do so, that an order of disbarment must necessarily follow.

Realizing that a reasonable time should be given respondent to get his business in order before the suspension becomes effective he is granted 30 days from the effective date of this opinion for that purpose and the year of suspension is to run therefrom. All costs of this proceeding, including the fees of the referee, are taxed to respondent.

JUDGMENT OF SUSPENSION.