STATE OF NEBRASKA EX REL. NEBRASKA STATE BAR ASSOCIATION, RELATOR, v. EDMUND HOLLSTEIN, RESPONDENT.

274 N. W. 2d 508

Filed January 10, 1979. No. 41124.

Paul L. Douglas, Attorney General, and Chauncey C. Sheldon, for relator.

M. J. Bruckner of Marti, Dalton, Bruckner, O'Gara & Keating, for respondent.

Heard before SPENCER, C. J., Pro Tem., BOSLAUGH, McCOWN, CLINTON, BRODKEY, and WHITE, JJ., and KUNS, Retired District Judge.

BRODKEY, J.

This is an original disciplinary proceeding brought in the name of the State of Nebraska on relation of the Nebraska State Bar Association against Edmund Hollstein, a lawyer duly admitted and licensed to practice his profession in this state.

Formal charges were filed against the respondent in this court on October 28, 1976, alleging respondent had violated DR1-102 (A) (5) and (6); DR5-103 (A); DR5-104; DR5-105 (A) and (B); DR7-101 (A) (1); DR7-102 (A) (3) and DR7-104 (A) (1) and (2) of the Code of Professional Responsibility of the Nebraska State Bar Association. The respondent was also charged with violating EC5-7 and EC8-8 of that code.

The referee appointed by this court held a hearing on the formal charges in the Sheridan County courthouse at Rushville, Nebraska, on June 23, 1977, and filed his report in this court on February 22, 1978. He found that the respondent had violated the aforementioned disciplinary rules as set out in Counts I to V of the formal charges (with the exception of one of the charges contained in Count I), and recommended that respondent be suspended from the practice of law for a period of two (2) years. Respondent has filed exceptions to the report of the referee, and the matter is now before us for review of his report.

Before discussing the merits of the allegations contained in the five counts of the formal charges against the respondent, it will be helpful to examine the background for those charges. With the exception of the allegation contained in Count V of the formal charges, all of the other charges arise out of

dealings he had with various members of the Robins family, longtime Sheridan County residents. Bennett Robins and his wife, Frieda, were married on June 7, 1916. They had four children, including two sons, Clifford and Leonard. Leonard was a mongoloid child who was unable to care for himself to any significant degree. Both Bennett Robins and Leonard Robins are now deceased. Bennett and Frieda owned a ranch consisting of approximately 6,000 acres in Sheridan County.

On April 1, 1959, Frieda commenced an action for divorce against her husband, Bennett Robins, and respondent represented Frieda in that action. The decree entered in that case on April 18, 1961, awarded and set over the Robins ranch to Bennett Robins, and provided, among other things: "That the responsibility for paying for the care, custody, control and supervision and the education of Leonard Edwin Robins, son of said parties shall be and hereby is charged and confided to the defendant [Bennett Robins] and that said party is ordered, as long as is necessary, to support and provide for said son, in the same manner that he has been doing for many years last past." Since respondent participated in the preparation of the divorce decree, and also the stipulation upon which it was based, it is clear that he was aware of the provision imposing the obligation for support of Leonard upon the defendant, Bennett Robins.

Approximately 1 month later, on May 29, 1961, Bennett Robins contracted to sell the ranch to his son Clifford for a price equal to an appraisal made by the Federal Land Bank. In order to acquire a loan from the Federal Land Bank, it was necessary that the judgment lien for the care of Leonard be subordinated to the lien of the Federal Land Bank. On June 1, 1962, Bennett made an application to the District Court for Sheridan County to modify the aforementioned divorce decree so as to make the

"potential lien of care for Leonard Edwin Robins to be junior and inferior to said lien of said Federal Land Bank of Omaha." In support of the application for modification, Clifford filed an affidavit agreeing to assume the potential lien for the support of his brother if his father should default. The court modified the divorce decree on June 4, 1962, providing, among other things: "It is further ordered that subject to the lien of said Land Bank mortgage, the real estate sold by defendant to Clifford Robins shall be changed (sic) with the lien for the support of said incompetent until discharged by the death of said incompetent or otherwise as provided by law; * * *." The court, however, did not transfer the responsibility for the care of Leonard to Clifford Robins. Respondent did not represent any of the parties in this proceeding, but was aware of the lien for support of Leonard by discussions he had with Bennett and Clifford. Bennett deeded the ranch to Clifford on June 12, 1962, and on August 30, 1962, Clifford and his wife, Dorothy, gave a mortgage to Bennett in the amount of $36,000, which mortgage was secured by the ranch but was expressly made junior and inferior to existing liens of record. Respondent did not draft any of the documents involved in these transactions nor represent any of the parties thereto.

However, the record reveals that respondent did represent Clifford Robins in a guardianship proceeding for Leonard Robins. He drafted the necessary documents for that purpose, and on September 9, 1963, filed the petition in the county court of Sheridan County requesting that the court appoint Clifford as Leonard's guardian; and on November 17, 1963, the court entered an order to that effect. Apparently, the guardianship was set up so Clifford could obtain state aid for Leonard, his incompetent brother. Although it is claimed the guardianship was inactive and that nothing further was ever done in connection

with the guardianship after Clifford was appointed guardian, the record does not reveal the guardianship was closed or that Clifford was discharged as guardian. As a matter of law, at all times involved herein, Clifford was the legal guardian of Leonard.

Next, in the chronology of events, it appears that on September 16, 1970, Dorothy Robins filed a petition for divorce against her husband, Clifford, in the District Court for Sheridan County. A divorce decree was entered on February 8, 1971. Prior to filing the petition, both parties had contacted respondent concerning representation; but the respondent, because of his friendship with both parties, declined to represent either of them, and recommended that they obtain their own respective counsel. Dorothy then retained Michael Smith as her attorney, and Clifford retained Gordon Shaffer. The decree provided for specified payments of child support for each of the four children, and alimony to Dorothy, payable in installments, and specifically provided that the settlement be secured by the Robins ranch.

Although respondent did not represent Clifford or Dorothy in their divorce proceedings, it is clear from the record that he did represent Clifford Robins both before and after July 20, 1972, on which date respondent and/or his wife obtained a proprietary interest in the Robins ranch under the circumstances hereinafter related. In this connection, respondent concedes and acknowledges that the interest obtained in the transaction was really his, notwithstanding the fact that his wife's name appears as grantee in the conveyance in question.

The events leading up to the transactions on July 20, 1972, are that on April 5, 1972, Clifford Robins, who had apparently decided to abandon his ranching operations and to commence racing dogs, leased a portion of the ranch to one Don Forney. The lease was drawn by respondent and gave Forney the right of first refusal in the event Clifford decided to sell

the ranch. Shortly thereafter, Clifford became interested in purchasing a dog kennel in Sioux City, Iowa, but lacked sufficient funds at that time to do so. Clifford therefore attempted to borrow the necessary money from the Stockmen's National Bank of Rushville, but was unable to do so because the bank required that it have a second mortgage, which meant there would have to be a subordination of Leonard's support lien, Bennett's mortgage, and Dorothy's child support and property settlement lien. In an effort to accomplish this result, Clifford asked Dorothy Tinsley, his former wife who had since remarried, to meet him in respondent's office to discuss subordination of her liens. While at respondent's office, Dorothy announced that she would like to consult with her own attorney, Michael Smith, of Gordon; whereupon respondent told them to go to Smith's office and discuss the matter. The record reflects that respondent called Michael Smith and informed him that he was sending Dorothy and Clifford to talk to him. On the following day, after discussing the matter with Michael Smith, Dorothy informed Clifford that she would not subordinate her liens against the ranch. These conversations occurred about July 17, 1972.

On or about that same date Clifford visited his father and discussed releasing the mortgage Bennett held against the property, and also discussed the future responsibility for Leonard's care. Clifford testified that Bennett told him he did not want the money but only wanted Clifford to take care of him, and decided they should "Go down and get this mortgage released." Clifford had never made any payments to his father on the mortgage, but testified his father wanted to release the mortgage to assist him in refinancing the ranch. Thereafter, on July 18, 1972, they both went to respondent's law office and requested him to draft the necessary instruments to release the mortgage, which respondent

did. Bennett signed the release at that time. There was also a discussion with reference to transferring the responsibility for Leonard's support back to Bennett so Leonard might continue to obtain state aid. Respondent informed both Bennett and Clifford that while they could file a release of the judgment for Clifford's care of Leonard, it would not be effective until an application for that purpose was approved by the court. These actions would seem to belie respondent's contentions that Bennett did not consult respondent at any time seeking independent professional judgment concerning the advisability of executing the release of the mortgage or the release of the judgment for the care and support of his son. We believe the acts of respondent, with respect to these matters, were clearly more than ministerial, and constituted the practice of law. It would appear respondent was acting as an attorney for Bennett in connection therewith.

In any event, it is undisputed that respondent did draft the release of the judgment for the parties, and Bennett signed it on July 20, 1972. The release was filed in the District Court for Sheridan County on July 25, 1972. Respondent contends, however, that he advised them that the release was of no force and effect until approved by the court. He disclaims any responsibility for obtaining such court approval because of the advice he gave them that the court's approval was necessary before being effective. The record does not reveal any specific instructions or agreement between the respondent and his clients from which it may be concluded that the clients were charged with the responsibility of obtaining the court's approval. It is clear the respondent was consulted by Bennett and Clifford for the purpose of releasing the judgment in order to shift the responsibility for Leonard's support back to Bennett; in fact, the respondent drafted the documents in question for them.

It appears Clifford continued to have problems in arranging financing for the purchase of the dog kennel, and therefore went to respondent's office on July 20, 1972, and asked the respondent to contact Don Forney with reference to purchasing Clifford's ranch. Forney came to respondent's office and talked to Clifford about the sale and purchase of the ranch. Clifford and Forney eventually agreed upon a figure based on an estimate of $40 per acre for the 6,000 acres. Forney testified it was Clifford who set the price and he paid Clifford the price he asked. Forney testified that because he did not have the cash necessary to pay for the ranch, he asked the respondent if he would like to join him as a partner in buying the ranch. Forney testified he knew respondent owned considerable land holdings and might be interested in becoming a partner with him in purchasing the ranch. After thinking about the matter for a short time, respondent agreed to join Forney in the purchase of the ranch. Respondent then called his wife, Marian, into the office and informed her she had just bought some land. This news made Mrs. Hollstein very unhappy, as she did not want her husband to take on any more responsibilities. Nevertheless, on that same date, July 20, 1972, an agreement, drafted by respondent, was entered into between Clifford L. Robins and Madeline C. Robins, husband and wife, as first party, and Donald W. Forney and Marian Hollstein, as second party. Simultaneously Clifford and Madeline executed a warranty deed conveying the property to Donald W. Forney and Marian A. Hollstein as tenants in common, as grantee. Respondent has admitted and agreed that although the instruments were drafted listing his wife as the grantee and purchaser, the transaction should be considered the same as if he had personally been a party thereto. Respondent has cited authority to the effect that it is not illegal for an attorney to purchase property

owned by his client, providing full and fair disclosure is made of all the circumstances. It is not clear from the record why respondent placed the title to the property in the name of his wife, and also made her a party to the contract with Clifford Robins and his wife Madeline; but it is suggested in the record that it may have been for estate planning purposes. Under the agreement which respondent drafted, Clifford, Donald Forney, and Marian Hollstein, agreed, among other things, to assume the property settlement and child support judgments owed to Clifford's first wife Dorothy. The agreement provided: "It is agreed that any possible liability of Clifford L. Robins for the support of his brother, Leonard E. Robins is the responsibility of First Party and shall not be in any way a lien or charge on said land and Bennett A. Robins having today for valuable consideration received from Clifford L. Robins, executed a release to the said Clifford L. Robins, also known as Clifford Leon Robins, this consideration being $500.00 is held for the benefit of the said Leonard E. Robins, also known as Leonard Edwin Robins." The warranty deed to Donald W. Forney and Marian A. Hollstein, as tenants in common, was also made subject to the Federal Land Bank mortgage, the property settlement judgment with Dorothy L. Robins and the child support judgment, which Donald Forney and Marian Hollstein assumed and agreed to pay on or before the due dates and to save and hold grantors free and clear of any liability thereon; and was also subject to the 1971 taxes, and other items.

Thereafter, on August 11, 1972, the State terminated the payments it had been making for Leonard's care; and the respondent, feeling the court would probably not approve the judgment release, informed Clifford that he would continue to have the responsibility for taking care of Leonard. Clifford then took Leonard to the ranch, where Leonard

lived until his death, on June 10, 1974.

Upon learning of the purchase of the property by the respondent, Dorothy Robins Tinsley contacted him concerning a possible lump sum agreement for the property settlement payments provided for in her divorce decree from Clifford. It appears Dorothy and her family had been friends and social acquaintances of respondent and his family prior to her divorce from Clifford, and respondent relies on this fact as justification for his having conversations with Dorothy relative to her lien upon the ranch arising from her divorce decree. The record does not reveal the exact date upon which Dorothy initiated her first contact with respondent about the release of the judgment lien; but it is clear both she and Michael Smith, her attorney, had conversations with respondent about the situation. The record reveals instances in which respondent made calls of a social nature to Dorothy, but in each of these calls it appears respondent also discussed business matters with Dorothy relative to the settlement of her claims against the ranch. Introduced into evidence at the hearing before the referee was a letter written by Dorothy to her attorney, Michael Smith, under the date of January 3, 1973, in which she stated, among other things: "I received a letter from Ed Hollstein about my property settlement he claims they can't pay me off because of you. * * * He claims since you are after Cliff about Leonard that makes my situation different because you are going to put a lien on the ranch. * * * He did say if I would call you off they would be glad to settle it in full at 9%. I just told him I never had anything to do with what you had to do. * * *

"Please write and let me know what you think and see if you think I can still get my yearly income." Michael Smith thereupon wrote his client Dorothy, suggesting she send him a copy of the letter from the respondent which she referred to and also suggested

she continue corresponding with the respondent and provide him with copies of all future letters the respondent wrote to her. Michael Smith testified he had never received a copy of the letter Ed Hollstein wrote to Dorothy, referred to in her letter to Smith dated January 3, although Dorothy wrote Smith that she had sent him the letter. However, Dorothy testified she might have been mistaken as to whether the communication between Ed Hollstein and her was by letter or not, and it might very well have been in a telephone conversation. She insisted, however, there had been such a communication by respondent to her in which the statements about which she had written Michael Smith had been made to her by respondent. Apparently Michael Smith was the person who filed the original complaints which resulted in this disciplinary action.

Count V of the formal charges filed against respondent concerns itself with a totally unrelated matter. It appears that in 1975 respondent was the city attorney and part-time city prosecutor for the city of Hay Springs; and was retained to represent one Donald Toof, who had a criminal complaint filed against him by the county attorney of Sheridan County. The defendant, represented by respondent, subsequently entered a guilty plea and was fined. At that time advisory opinion No. 72-13 of the Nebraska State Bar Association provided that a city or village attorney whose duties include prosecuting violations of ordinances and state statutes may not voluntarily represent anyone charged with a crime. That opinion was later supplemented by the addition of the words "unless his employment as attorney for defendant is approved by an order of the court wherein the case is pending." Respondent admits he did not obtain approval of the court of his representation of Mr. Toof before appearing as defense counsel in the case. Respondent admits his violation of the afore-

mentioned advisory opinion, but in mitigation thereof alleges he was unaware of the opinion and has since entered into an agreement with the city of Hay Springs to the effect that he would only represent the city in civil matters and as legal advisor, and would not act as city prosecutor henceforth.

It will be helpful at this point to set out the standard of review in this court of proceedings such as this. We have held that the relator must establish the allegations in the formal charges by a clear preponderance of the evidence, so the court is satisfied to a reasonable certainty that the charges are true. State ex rel. Nebraska State Bar Assn. v. Rhodes, 177 Neb. 650, 131 N. W. 2d 118 (1964). The findings must be sustained by a higher degree of proof than that required in civil actions yet falling short of the proof required to sustain a conviction in a criminal action. State ex rel. Nebraska State Bar Assn. v. Richards, 165 Neb. 80, 84 N. W. 2d 136 (1957). Also, in a proceeding for the disbarment of an attorney at law the presumption of innocence applies, and the charge made against him must be established by a clear preponderance of the evidence. State ex rel. Nebraska State Bar Assn. v. Richards, *supra*; State ex rel. Nebraska State Bar Assn. v. Pinkett, 157 Neb. 509, 60 N. W. 2d 641 (1953).

Count I charges respondent with violating DR5-105 (B) and DR7-104 (A) (2) by participating in transactions whereby Clifford Robins secured a release from Bennett Robins of a $36,000 mortgage without consideration or with inadequate consideration; and with shifting the burden of support of Leonard, Bennett's incompetent son, from Clifford to Bennett at a time when Bennett himself was ill and destitute. The referee found the charges in Count I, with reference to Clifford Robins securing the release from Bennett Robins of the $36,000 mortgage, were not sustained by a clear preponderance of the evidence, as the testimony is undisputed that Bennett wanted

to give the mortgage to Clifford and to release it of record in order to assist Clifford in refinancing the ranch. We agree. However, the referee did find the respondent had violated DR7-104 (A) (2), with reference to shifting the burden of support for Leonard Robins, by giving advice to Bennett Robins who was not represented by a lawyer, when Bennett's interests were in conflict with the interests of the respondent's client, Clifford Robins; and by so advising at a time when the father was ill and without financial resources. There can be little doubt that an attorney-client relationship existed between respondent and Clifford Robins on July 18, when Clifford and Bennett came to respondent's office to get the release of the mortgage prepared, and they discussed the release of the judgment for Leonard's support. There is, however, a question as to whether the evidence clearly shows an attorney-client relationship existed at that time between respondent and Bennett Robins, although respondent, in his testimony with reference to what transpired at that time, admitted he told Clifford with regard to his representation: "So let us just say I was representing both of you when I made the release, right?" And Clifford answered "Yes. Right." The referee concluded that in advising both Clifford and Bennett in reference to the release of the judgment of the support of Leonard, respondent was in violation of either DR7-104 (A) (2) or DR5-105 (B), since Clifford was being relieved of the obligation for Leonard's care, which was adverse to Bennett's interest because he was reassuming the obligation for Leonard's support for a cash consideration of only $500. The referee concluded, however, if there was an attorney-client relationship between respondent and Bennett Robins at the time of the conference on July 18, 1972, there would not be a violation of DR7-104 (A) (2) because respondent would be representing both parties to whom he gave advice in reference to

releasing the judgment for the support of Leonard. We conclude that while the circumstances were, indeed, highly suspicious, and susceptible to more than one construction, we do not believe the evidence establishes to a reasonable certainty that the charges are true.

With respect to Count II, the referee found respondent violated DR5-105 (B) and DR7-101 (A) (1) in failing to take steps to protect the interest of Clifford's incompetent brother, Leonard, and that respondent knew, at that time, Clifford was the guardian for Leonard, since respondent was the attorney who conducted the guardianship proceedings in which Clifford was appointed. While the evidence with reference to this charge is again susceptible to more than one interpretation, we conclude that this charge, too, has not been established by a clear preponderance of the evidence. There seems to be little question that the obligation which was imposed upon Bennett A. Robins by the provisions of the divorce decree of 1961 for Leonard's care, custody, control, and supervision, whether or not those provisions resulted in a lien on the ranch, was never modified so as to shift the responsibility from Bennett to Clifford, as a matter of law. However, it is clear Clifford assumed that responsibility and took care of Leonard up until the time of his death. It seems clear Leonard Robins was not at any time a client of respondent, and hence there was no violation of DR5-105 (B) which prohibits "Continuing multiple employment when exercise of independent professional judgment adversely affected representation of another client." Respondent's client was Clifford Robins. It must also be remembered that the release of the judgment in question was probably ineffective under Nebraska law because of the fact it was not approved by the court, and there is a question in this case as to who had the responsibility of obtaining such court approval. Apparently the At-

torney General also agrees there was no violation of Count II, about which more will be said later in this opinion.

The referee next found the respondent guilty of the charges contained in Count III, which alleged a violation of various Disciplinary Rules and Canons of Ethics set forth in the formal charges. This count concerns itself with the propriety of respondent obtaining an interest in the Robins ranch from Don Forney who had purchased it from Clifford Robins. The entire transaction was negotiated in one day, July 20, 1972, in respondent's office. It seems clear, however, that the transactions between Clifford Robins and Don Forney were initiated by Clifford, and the sale price was arrived at by conversations between Robins and Forney. It was only after the terms had been agreed upon that respondent was invited by Forney to become his partner in the transaction. Respondent acquired a proprietary interest in the property through his wife, in whose name title to the property was taken as a tenant in common with Forney. We concede the transactions in question were of a very suspicious nature which might lead someone, not knowing the facts, to conclude there was overreaching and unethical procedures involved. In State ex rel. Nebraska State Bar Assn. v. Richards, *supra,* we stated, quoting from Opinion 49 of the Committee on Professional Ethics and Grievances of the American Bar Association, page 134: "An attorney should not only avoid impropriety but should avoid the appearance of impropriety." Had respondent been charged with the violation of this canon, or DR9-101 which apparently limits somewhat the scope of that prohibition, we would have little difficulty finding a violation thereof by the respondent. However, respondent points out that it is not a breach of ethics for an attorney to acquire an interest in property of his client where full disclosure of all the circumstances are made.

See Annotation, Attorney and Client: Disciplinary proceeding based upon attorney's direct or indirect purchase of client's property, 35 A. L. R. 3d 674, et seq. There seems little doubt that full disclosure was made to all the parties involved in the transaction of July 20, 1972, and all parties involved knew the facts and circumstances regarding the transaction. Under the standard of review adopted by this court, we find no violation occurred as charged in Count III.

The referee also found respondent guilty of violating DR7-104 (A) (1) as charged in Count IV of the formal charges. That disciplinary rule provides that during the course of his representation of a client a lawyer shall not communicate or cause another to communicate on the subject of the representation with a party he knows to be represented by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so. While respondent did not represent either Dorothy or Clifford in their divorce proceedings, primarily because of his friendship with both of them, he knew at all times that attorney Michael Smith represented Dorothy, and he did have certain conversations with her on various occasions regarding the release of Dorothy's lien on the ranch. Respondent also knew on July 20, 1972, when he entered the transaction with Forney to purchase the Robins ranch, that Michael Smith represented Dorothy Robins Tinsley in reference to her property settlement liens. Michael Smith also testified he had a personal telephone conversation with respondent on July 31, 1972, with reference to the property settlement payments, and again on August 8, 1972. It is also clear from the record that after respondent acquired an interest in the ranch in the transaction of July 20, 1972, he talked to Dorothy in person, corresponded with her by letters and talked to her on the telephone on various occasions with

reference to the settlement of the property lien against the ranch and in regard to the child support payments due under the divorce decree. Respondent also had invited Dorothy to call at his office the next time she was in Rushville so they could discuss certain matters.

The referee found, in mitigation of this charge, that subsequent to January 12, 1973, Michael Smith wrote a letter to Dorothy in which he instructed her to write a letter directly to respondent and to demand the property settlement as required by the divorce decree. He found that Smith's consent to further correspondence between respondent and Dorothy was implied and fell within the exception clause of DR7-104 (A) (1) prohibiting communication with a party he knows to be represented by a lawyer "unless he has the prior consent of the lawyer representing such other party." Dorothy also testified she had no complaint against the respondent, and respondent did nothing to take advantage of her. While we do not believe prior existing friendships and social contacts between an attorney and third parties justify a violation of DR7-104 (A) (1), we feel constrained to hold that the charge contained in Count IV is not sustained by a clear preponderance of the evidence.

The referee also found the respondent had violated DR5-105 (A) and EC8-8 of the Code of Professional Responsibility and Ethical Considerations. Although originally denied, respondent has now admitted that the allegations in Count V are true and correct. He attempts to excuse his conduct on the ground he was unaware of the advisory opinion of the Nebraska State Bar Association prohibiting a city or village attorney, whose duties include prosecuting violations of ordinances and state statutes, from voluntarily representing anyone charged with a crime. Respondent did so in the case of his representation of Donald Toof. In State ex rel. Nebraska

State Bar Assn. v. Holscher, 193 Neb. 729, 230 N. W. 2d 75 (1975), we stated: "We have repeatedly recognized the ancient maxim that ignorance of the law is no excuse. It is a maxim sanctioned by centuries of experience. * * * It applies with even greater emphasis to an attorney at law who is expected to be learned in the law. It should be particularly applicable to a county attorney who should make himself fully conversant with the duties of his office." While Holscher dealt with the failure of a county attorney to know the statutory law of the state, we believe the same reasoning may be applied with reference to disciplinary rules and opinions on disciplinary matters, particularly those applicable to the performance of his duties as a public officer, such as a county or city attorney. We take judicial notice that the Code of Professional Responsibility of the Nebraska State Bar Association, including the Disciplinary Rules and advisory opinions, have been circulated to all members of the Nebraska State Bar Association. Respondent is clearly guilty of the charge against him contained in Count V.

We call attention to a rather unique aspect of this case, which is that the Assistant Attorney General of the State of Nebraska, representing the relator, Nebraska State Bar Association, in his brief filed on appeal in this matter, as well as in his oral argument, apparently agrees with the contentions made by respondent and states he is not fully persuaded that some of the findings in the report of the referee are supported by a clear preponderance of the evidence. He states: "The only disciplinary or ethical consideration violation which we feel is supported by a clear preponderance of the evidence is that under Count V, pertaining to respondent's representation of a defendant in a state statute criminal prosecution." He further states, however, that Count IV, relating to communications with a party represented

by counsel, is, in his judgment, borderline. He concludes: "The final, and in some respects possibly the most difficult, matter for consideration is the fact of the respondent having previously been suspended from practice by this court, in 1961, on account of a federal income tax violation." It is his opinion that the 2-year suspension recommended by the referee "would appear to be unduly severe if this court should conclude, as have we, that not all of those findings are supportable on the record."

This brings us to a consideration of what the proper sanction to be applied to the respondent in this case should be. The evidence adduced in a disciplinary proceeding is reviewed de novo in this court to determine if discipline should be imposed, and, if it should, the extent thereof. State ex rel. Nebraska State Bar Assn. v. Rhodes, 177 Neb. 650, 131 N. W. 2d 118 (1964). There is little question that we may properly consider, and, in fact we should consider, that respondent has heretofore been suspended from the practice of law in this state for a period of 1 year from August 3, 1961, for income tax evasion. He has since reapplied for admission to the bar of Nebraska and has been readmitted. However, he is subject to further discipline in this case. On the totality of the circumstances in the record before us, we believe that censure of respondent would be an appropriate penalty. We feel what we have stated in this opinion is a sufficient censure of respondent's failure to fully live up to his responsibility as a lawyer; and we therefore censure him, with the admonition that in the future he be more circumspect of his conduct.

Costs, including the fee of the referee, are taxed to the respondent.

JUDGMENT OF CENSURE.

SPENCER, C. J., PRO TEM., dissenting.

I respectfully dissent from the majority opinion herein because I believe the findings of the referee

are sustained by the record. Edmund Hollstein should be suspended from the practice of law as recommended by the referee.

I agree with the referee, respondent violated DR5-105 (B) and DR7-101 (A) (1) in failing to take steps to protect the interests of Clifford's incompetent brother Leonard. Respondent knew his client Clifford was the guardian for Leonard, since he was the attorney who conducted the guardianship proceedings in which Clifford was appointed the legal guardian for Leonard. He knew that Clifford's interest in releasing the ranch from the lien of support for Leonard was in conflict with Leonard's interest of having this lien as security for his continuing support. As attorney for the guardian, he essentially was the attorney for the incompetent, and owed a duty to the ward to protect his interest in the property.

Respondent argues it was the duty of the court to protect the rights of the incompetent. This to me demonstrates a woeful lack of appreciation for his responsibility. Respondent was an officer of the court, who had full knowledge of the situation and who actually was the attorney for the incompetent. It was his duty to fully apprise the court of what was happening and to show how it would affect the rights of the incompetent.

I also agree with the referee that the respondent violated all of the disciplinary rules and canons of ethics set forth in Count III of the formal charges. In addition to the evidence enumerated in Count I, disclosing there was an attorney-client relationship between respondent and Clifford Robins on several occasions prior to July 20, 1972, the record shows on that date Clifford again came to respondent's office and asked him to get in touch with Don Forney about buying the ranch. Respondent called Forney on the telephone and Forney came to respondent's office that same day and talked to Clifford Robins about

the sale of the ranch. Respondent was the only attorney involved and helped the parties negotiate the terms. During the negotiations Don Forney asked respondent to become a partner with him in purchasing the ranch from Clifford. Respondent did so, and named his wife as a tenant-in-common with Forney in the contract and deed. At all times respondent knew the ranch was subject to a lien for the support of Leonard, as ordered by the court. He also knew that it was subject to liens for property settlement and child support in the District Court for Sheridan County in the divorce proceedings between Dorothy Robins Tinsley and Clifford Robins. In both of these cases the ranch was the subject matter of litigation in which respondent acquired a proprietary interest through his wife.

I also agree with the referee that respondent violated DR7-104 (A) (1) of the Code of Professional Responsibility, as alleged in Count IV. Respondent did not represent either Dorothy L. Robins or Clifford L. Robins in their divorce case. Sometime in June 1972, Clifford and his second wife, and Dorothy Robins Tinsley, formerly Dorothy L. Robins, came to respondent's office in Rushville. At that time Dorothy told respondent that Michael Smith was her attorney. Dorothy Tinsley had gone to respondent's office with Clifford Robins to discuss the subordination of her liens for property settlement and child support against the ranch so Clifford could get another loan from the bank. Respondent subsequently called Smith so he was well aware that Smith was her attorney.

The evidence is clear that on July 20, 1972, when respondent entered into the transaction with Donald Forney to purchase the ranch from Clifford Robins, he had personal knowledge of Michael Smith's representation of Dorothy Robins Tinsley in reference to her property settlement and child support liens against the ranch. After he acquired a proprietary

interest in the ranch, he talked to Dorothy Robins Tinsley in person, corresponded with her directly by letters, and talked to her on the telephone numerous times in reference to settlement of her property settlement lien against the ranch and in regard to child support payments due under the divorce decree. His conduct in talking directly to the client of another attorney cannot be excused on the ground they had been personal friends. If respondent did not understand that when a friend is represented by another attorney he could not deal with her personally about the subject matter of the other attorney's employment, he is not qualified to practice law.

For all of these reasons, I believe the recommendation of the referee should have been adopted. I cannot go along with a slap on the wrist in this instance. The respondent should be suspended from the practice of law.

CLINTON, J., concurring in part and dissenting in part.

I believe the evidence supports the finding of the referee that the respondent did violate DR5-105 (B) and DR7-101 (A) (1), in acting adversely to the interest of the incompetent ward and was therefore guilty on Count II of the complaint. However, as the report of the referee shows, no harm did result from the violation, nor does it appear that harm was intended or likely to result.

I believe also that the evidence clearly supports the finding of the referee on Count IV of the complaint in that respondent communicated with the client of another lawyer without consent. The referee properly points out, however, that the violation was a technical one with no harm resulting or intended and no advantage was taken of anyone.

I otherwise agree with the majority opinion.

The judgment of reprimand is sufficient under the circumstances of this case.